IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAMA HAMMOUD,                    *

    Plaintiff,                   *

v.                               *        Civil Action No. GLR-21-1593

JIMMY'S SEAFOOD, INC.,           *

    Defendant.                   *

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Jimmy's Seafood, Inc.'s ("Jimmy's") Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 20). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will deny the Motion.

## I.  BACKGROUND[1]

### A.  Factual Background

Plaintiff Lana Hammoud was employed by Jimmy's from October 2015 to February 2018 and again from February 2019 until August or September 2020. (Am. Compl. ¶¶ 7, 67–70, ECF No. 13). Hammoud worked as a server and bartender. (Id. ¶ 7). Hammoud's manager at Jimmy's was Saad Abou El Seoud ("El Seoud"). (Id. ¶ 10). Although El Seoud was primarily a kitchen manager, his supervisory duties also extended to servers and

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint (ECF No. 13) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

bartenders. (Id. ¶ 11). He had the authority to assign tasks to Hammoud and take disciplinary action against her. (Id.). El Seoud regularly disciplined, suspended, and discharged employees. (Id.).

Hammoud is Muslim. (Id. ¶ 13). El Seoud started to treat Hammoud harshly after she began bartending in September 2019. (Id. ¶ 14). El Seoud's behavior worsened after Hammoud's sister, Dania Hammoud ("Dania"), joined Jimmy's as a bartender in October 2019. (Id.). Dania is also Muslim. (Id. ¶ 13). El Seoud told Hammoud that "Muslims do not work in bars or serve alcohol." (Id. ¶ 15). El Seoud also told Dania, "you are not Muslim because you drink and you serve alcohol." (Id. ¶ 16). El Seoud would also refuse to allow customers to buy Hammoud and Dania shots, while allowing customers to buy shots for non-Muslim bartenders. (Id. ¶ 18). At an event in December 2019, El Seoud saw Dania drinking and speaking to a man and became upset. (Id. ¶ 19). El Seoud proceeded to spend "more than an hour standing directly . . . behind Dania glaring at both [Hammoud] and her sister." (Id.). After the bar closed, El Seoud began screaming at Hammoud and making unfounded accusations about her performance. (Id. ¶ 21).

The following day, Dania informed her second-level supervisor, Mr. Hadel, that El Seoud was targeting her and Hammoud for being Muslim and that El Seoud was being abusive toward them. (Id. ¶ 23).[2] Hammoud met with Hadel later that day and reiterated

---

[2] In this paragraph and on several other occasions in the Amended Complaint, Hammoud mistakenly advances the dates in her recitation of events by one year. Notwithstanding Jimmy's breathless assertion that Hammoud's timeline is "all over the place," (Def.'s Reply Further Supp. Mot. Dismiss Pl.'s First Am. Compl. at 3 n.2, ECF No. 28), these typographical errors are easily identified by placing the allegations in the context of the broader chronology.

Dania's complaints, specifically reporting "that she and her sister were being harassed by El Seoud because they were not acting in accordance with his religious beliefs for how Muslim women should behave and he did not like them serving or drinking alcohol or talking to male guests." (Id.).

El Seoud's hypercritical behavior continued into the following year. For instance, in January and May 2020, El Seoud repeatedly accused Hammoud of stealing hours even though she "was extremely diligent about promptly clocking-out at the end of her shifts." (Id. ¶¶ 25, 42). El Seoud also targeted Hammoud and Dania with special menial tasks far more than other bartenders. (Id. ¶ 26). El Seoud told Dania one evening that she and Hammoud "weren't Muslim" and their mother "didn't do a good job raising [them]." (Id. ¶ 29). El Seoud also "made comments regarding his belief that the Plaintiff and her sister drinking alcohol, serving drinks and the way they dressed for work were improper for Muslim women." (Id.). El Seoud frequently stared at Hammoud and Dania "with obvious disapproval and hostility while they were performing their jobs and abruptly and rudely interrupt[ed] conversations they were having with male guests of the restaurant." (Id. ¶¶ 31, 33–34). On at least five occasions, El Seoud searched Hammoud's handbag but did not search the handbags of employees who were not Muslim women. (Id. ¶ 35). In May 2020, El Seoud spotted Hammoud drinking after hours with her coworkers, grabbed the drink from her, and threw it away in front of her coworkers. (Id. ¶ 36).

That same month, the month of Ramadan, El Seoud told Hammoud she needed to wear sleeves that covered her shoulders at work and could not "wear the Jimmy's Famous Seafood tank top that other similarly situated, non-Muslim servers and bartenders

continued to wear without incident." (Id. ¶ 39). He also criticized Hammoud for not fasting during Ramadan. (Id. ¶ 41). Robert "B.J." Parker, Jimmy's General Manager and a close friend of El Seoud's, told Hammoud that she needed to wear longer shorts to cover her legs, even though her shorts were longer than those of many of her coworkers. (Id. ¶ 47). Later, in July 2020, Floor Manager Amber Kraus told Dania that her shorts were too short. (Id. ¶ 49). When Dania responded that her shorts were the same length as other bartenders, Kraus explained "that there was 'one manager' who was always complaining" about the length of Dania's shorts, but declined to identify the manager. (Id.). Dania and Hammoud frequently discussed El Seoud's discriminatory comments and behavior. (Id. ¶¶ 17, 27, 29).

In July 2020, Hammoud was removed from the schedule for a very lucrative event and had to produce evidence of positive reviews to get back on the schedule. (Id. ¶ 44). Other employees working the event had no such requirement. (Id.). At another event that month, Hammoud and Dania were forced to work a double-shift outdoors in nearly 100-degree weather and yelled at by managers if they stepped inside. (Id. ¶¶ 45–46, 48). Jimmy's did not subject other workers to similar treatment. (Id. ¶ 48).

Hammoud alleges that Jimmy's management ignored her complaints of discrimination and harassment. (Id. ¶ 43). On July 20, 2020, Tony Minadakis, a co-owner of Jimmy's, told Hammoud and Dania that Parker had described them during a manager's meeting as being "against" management. (Id. ¶ 50). This surprised them, as the only comments they had made to management had been about El Seoud's discriminatory behavior. (Id.). Hammoud and Dania also complained to Minadakis about the disparate treatment they had experienced on the subject of appropriate workplace apparel. (Id.). Later

that month, Hammoud complained to Kraus that she and Dania "were being held to a different standard than the rest of the staff due to their religion and gender" and that Hammoud was "still being harassed." (Id. ¶ 52).

On August 2, 2020, Floor Manager Gurvir Singh approached Hammoud and told her "that he had received two complaints about her and that she was suspended for two weeks." (Id. ¶ 54). Hammoud responded that both complaints were frivolous and explained why, but Singh responded that "all management" had decided to suspend her. (Id. ¶ 55). After the two-week suspension ended, Jimmy's did not place Hammoud back on the schedule or ask her to return. (Id. ¶ 58). When Jimmy's issued yet another new schedule on August 26, 2020, Hammoud still was not on it. (Id. ¶ 59). The following day, Hammoud requested and received a copy of her two-week suspension notice. (Id. ¶ 60). She found that the notice included "a statement that she was being suspended for 'rudeness' and that this was her second warning, when she never received a first warning." (Id. ¶ 61). On August 31, 2020, Hammoud was not invited to an all-bartender meeting, even though suspended bartenders customarily attended such meetings. (Id. ¶ 63).

On September 3, 2020, Parker texted Hammoud and stated, "Not sure what happened to your schedule. If you're still interested in working here, I do need a server for tonight." (Id. ¶ 67). Hammoud viewed the short notice as a gambit to make her appear as though she did not want to return to work. (Id.). Hammoud came to view the workplace as intolerable and decided not to return. (Id. ¶¶ 67–69). Thus, rather than accept Parker's invitation, Hammoud "decided to pursue other options." (Id. ¶ 70).

**B.**     **Procedural History**

Hammoud filed her first charge with the Equal Employment Opportunity Commission ("EEOC") on November 9, 2020. (EEOC Charge at 1, ECF No. 20-3).[3] Hammoud received her right-to-sue letter on March 31, 2021. (Am. Compl. ¶ 72). Hammoud filed her initial Complaint on June 28, 2021. (ECF No. 1). On September 10, 2021, Jimmy's filed its initial Motion to Dismiss. (ECF No. 4). In response, on September 27, 2021, Hammoud filed the Amended Complaint (ECF No. 13).

Hammoud's five-count Amended Complaint alleges: religious discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") (Count I); religious discrimination and harassment in violation of the Maryland Fair Employment Practices Act, SG § 20-601 et seq. ("MFEPA") (Count II); sex discrimination and harassment in violation of Title VII (Count III); sex discrimination and harassment in violation of MFEPA (Count IV); and retaliation in violation of Title VII (Count V). (Am. Compl. ¶¶ 74–106).

---

[3] Although Jimmy's brings its Motion under Rule 12(b)(6), the Court "may consider . . . documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." Sposato v. First Mariner Bank, No. CCB-12-1569, 2013 WL 1308582, at *2 (D.Md. Mar. 28, 2013); see CACI Int'l v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009). Courts routinely determine that EEOC documents like the ones attached to the Jimmy's Motion are integral documents in employment discrimination actions. See, e.g., Britt v. Brennan, No. RDB-19-0401, 2020 WL 1701711, at *2 (D.Md. Apr. 8, 2020); Battle v. Burwell, No. PWG-14-2250, 2016 WL 4993294, at *9 n.8 (D.Md. Sept. 19, 2016); Mustafa v. Iancu, 313 F.Supp.3d 684, 687 (E.D.Va. 2018); Leftwich v. Gallaudet Univ., 878 F.Supp.2d 81, 90 n.2 (D.D.C. 2012); Lee v. Esper, No. 18-3606-TLW-KFM, 2019 WL 7403969, at *3 (D.S.C. Aug. 13, 2019), R&R adopted, 2020 WL 32526 (D.S.C. Jan. 2, 2020). As such, the Court will consider the EEOC documents attached to the Motion to Dismiss as integral documents.

On November 22, 2021, Jimmy's filed the instant Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 20). Hammoud filed an Opposition on December 28, 2021, (ECF No. 25), and on January 19, 2022, Jimmy's filed a Reply (ECF No. 28).

## II.   DISCUSSION

### A.   <u>Standard of Review</u>

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual

allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

## B.    Analysis[4]

Through its Motion, Jimmy's advances several challenges to the Amended Complaint, including: (1) the Court should disregard certain allegations that Jimmy's asserts are untimely; (2) Hammoud fails to plausibly allege an adverse action to support any of her claims; (3) Hammoud does not identify similarly situated comparators for her discrimination claims; (4) Hammoud fails to allege discriminatory conduct imputable to Jimmy's; and (5) Hammoud does not allege facts sufficient to satisfy any of the elements of her retaliation claim. The Court will address each argument in turn.

### 1.    Timeliness

Plaintiffs bringing Title VII claims in Maryland are subject to a 300-day statute of limitations. 42 U.S.C. § 2000e-5(e)(1); Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007). Jimmy's argues that because Hammoud filed her first discrimination

---

[4] Unless otherwise noted, the Court's Title VII analysis applies equally to Hammoud's claims under MFEPA. See Finkle v. Howard Cnty., 12 F.Supp.3d 780, 784 (D.Md. 2014) ("FEPA is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII." (citing Haas v. Lockheed Martin Corp., 914 A.2d 735, 742 (Md. 2007))).

charge on November 9, 2020, the Court must disregard any allegations supporting her claim that occurred before January 14, 2020. (Mem. Supp. Def.'s Mot. Dismiss Pl.'s First Am. Compl. ["Mot."] at 13–14, ECF No. 20). Jimmy's further argues that the Court must disregard any allegations in support of her sex discrimination and retaliation claims that occurred prior to February 19, 2020, as Hammoud only included those charges in her Amended EEOC Charge, filed on December 15, 2020. (Id.; see Am. EEOC Charge at 1, ECF No. 20-4). On this basis, Jimmy's asks the Court to disregard the majority of Paragraphs 1–32 of the Amended Complaint. (Mot. at 12–14). For three reasons, the Court disagrees and will consider the entirety of the Amended Complaint in rendering a decision.

First, the 300-day statute of limitations applicable to claims under Title VII only applies to the "unlawful employment practice," i.e., the adverse action or actions prompting the complaint. 42 U.S.C. § 2000e-5(e)(1); see Hughes v. Navy Fed. Credit Union, No. 1:10-CV-1430, 2012 WL 32404, at *8 (E.D.Va. Jan. 4, 2012) ("[A] Title VII Charge must be filed within 300 days of the adverse action."). Title VII plaintiffs are thus not prohibited from relying on allegations or evidence supporting their claims of protected activity, discriminatory or retaliatory animus, or causation that occurred prior to the 300-day window. Many of the paragraphs Jimmy's asks this Court to ignore include allegations of discriminatory animus that are entirely appropriate. (See, e.g., Am. Compl. ¶ 15 ("In the Fall of 2019 . . . [El Seoud] told Plaintiff that 'Muslims do not work in bars or serve alcohol.'"); ¶ 16 ("After Plaintiff's sister was hired as a bartender, [El Seoud] told Dania Hammoud that you are not Muslim because you drink and you serve alcohol.")).

Accordingly, the Court is not persuaded by Jimmy's demands that it ignore allegations of behavior that occurred prior to January or February 2020.

Second, the Court may consider allegations prior to January or February 2020 because Hammoud's discrimination allegations all allege a hostile work environment and are therefore subject to the continuing violation doctrine. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . The 'unlawful employment practice' therefore cannot be said to occur on any particular day." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). In such claims, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117. Here, of course, many of the discriminatory actions Hammoud alleges occurred within the filing period. Accordingly, the Court may consider all the allegations supporting her hostile work environment claims.

Finally, the Court notes that plaintiffs bringing claims of harassment under MFEPA have the benefit of a two-year statute of limitations on those claims. See Md. Code Ann., State Gov't § 20-1004(c)(3)(i). Accordingly, even if certain of Hammoud's allegations were untimely in the context of her Title VII claims, they would still be timely in the context of her MFEPA claims.

### 2.    Adverse Action

In support of all five counts, Hammoud attributes essentially three adverse actions to Jimmy's: (1) constructive discharge; (2) her two-week unpaid suspension; and (3) hostile work environment. (See, e.g., Am. Compl. ¶¶ 77, 101). Jimmy's argues that the Amended

Complaint does not include allegations sufficient to support any of these adverse actions. The Court will address each argument in turn.

### a.    Constructive Discharge

Hammoud alleges that Jimmy's constructively discharged her for discriminatory and retaliatory reasons. (See Am. Compl. ¶¶ 77, 90, 101). Jimmy's argues that the Amended Complaint does not include allegations sufficient to support a constructive discharge. At bottom, the Court disagrees and will allow those claims to proceed.

To establish a constructive discharge, "a plaintiff must show 'that [s]he was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign' and that she actually resigned." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019) (quoting Green v. Brennan, 136 S.Ct. 1769, 1777 (2016)). The conditions must go "beyond 'ordinary' discrimination." Id. (quoting Penn. State Police v. Suders, 542 U.S. 129, 147 (2004)). Courts evaluating constructive discharge claims must consider whether a plaintiff's workplace was so intolerable that she was compelled to resign under an objective, "reasonable person" standard. Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 262 (4th Cir. 2006). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004)). Moreover, "[i]n assessing intolerability, the frequency of the conditions at issue is important." Evans, 936 F.3d at 193. Thus, "[t]he more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is

isolated or infrequent, it is less likely to establish the requisite intolerability." Id. Finally, the Fourth Circuit has advised that courts should consider "the totality of the circumstances" in determining whether a resignation was, in fact, a constructive discharge. See Bodkin v. Town of Strasburg, 386 F.App'x 411, 413 (4th Cir. 2010).

Jimmy's first argues that the Court should not consider certain allegations relating to the mistreatment of Dania. Jimmy's contends that these allegations are irrelevant because Hammoud does not plausibly allege that she knew of those events while employed by Jimmy's. See Perkins v. Int'l. Paper Co., 936 F.3d 196, 207–08 (4th Cir. 2019) (finding that the testimony of others subjected to harassment "was relevant . . . only if [Plaintiff] 'was aware of [the harassment described in the testimony] during the course of her employment'" (quoting King v. McMillan, 594 F.3d 301, 310 (4th Cir. 2010))). The Court disagrees. Hammoud repeatedly alleged that she and Dania regularly discussed El Seoud's discriminatory comments and behavior. (Am. Compl. ¶¶ 17, 27, 29). Jimmy's is simply incorrect when it asserts that crediting these allegations "would require the Court to assume . . . that Hammoud and her sister worked every day, every shift, and every hour together for each and every allegation in which Hammoud mentions" Dania. (Mot. at 17). See Romero v. McCormick & Schmick Rest. Corp., 448 F.Supp.3d 1, 5 (D.Mass. 2020) ("The court finds no requirement in the statutory scheme, case law, or common sense that would preclude a hostile work environment claim because sexual conduct and statements were directed at co-workers only.").

Jimmy's next argues that the remaining allegations are insufficient to support a claim of constructive discharge because Hammoud has not adequately pleaded objective

12

intolerability. Jimmy's summarizes the extent of the support of Hammoud's constructive discharge allegation as follows:

> These allegations are: (a) [El Seoud's] alleged dress code and fasting comments, <u>see</u> [Am. Compl.] ¶¶ 39, 41, 47; (b) yelling that Hammoud needed to clock out after she "finished her shift[,]" <u>id.</u> ¶ 42; (c) required production of positive online reviews to work a golf tournament, <u>see</u> <u>id.</u> ¶ 44; (d) complaining about working shifts on the restaurant patio in the summer, <u>see</u> <u>id.</u> ¶ 45; (e) being told not to use an indoor machine during outdoor shifts, <u>see</u> <u>id.</u> ¶ 46; (f) an allegation that management discussed that Hammoud was "against" them, <u>id.</u> ¶ 50; and (g) Hammoud thought the "managerial team" was "acting cold", <u>id.</u> ¶ 52.

(Mot. at 18–19). Jimmy's asserts that these allegations represent "[m]ere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions [that] are not so intolerable as to compel a reasonable person to resign." <u>Heiko</u>, 434 F.3d at 262 (quoting <u>James</u>, 368 F.3d at 378).

As an initial matter, the recitation of events above portrays the pervasive discriminatory animus to which Hammoud was subjected in the light most favorable to Jimmy's, not the light most favorable to Hammoud. <u>See</u> <u>Albright</u>, 510 U.S. at 268 (requiring a court considering a Rule 12(b)(6) motion to construe the factual allegations in the light most favorable to the plaintiff). Another portrayal of those events could read as follows: Hammoud's supervisor repeatedly harassed her and her sister about their choice of apparel; repeatedly suggested that Hammoud and her sister were bad Muslims and insulted their parents; forced Hammoud to work a double-shift outdoors in blistering heat; repeatedly stared at Hammoud and her sister in a threatening manner for extended periods; repeatedly implied that Hammoud was stealing by questioning her about her hours and

searching her bags; and repeatedly embarrassed Hammoud in front of her colleagues and customers.

Setting aside the framing of these events, the narrative presented by Jimmy's omits certain material actions. First, of course, it omits the many instances of discriminatory animus displayed toward Hammoud's sister, of which Hammoud was aware. More importantly, it omits the two actions that punctuated the end of Hammoud's employment: the two-week suspension and Jimmy's subsequent failure to return Hammoud to the schedule following her suspension. Hammoud alleges that she was suspended on grounds that she alleges were pretextual and, upon the completion of her suspension, was left in limbo for a period of weeks, uncertain if she would ever be permitted to return to work.[5] Viewed in concert with the many other allegations of El Seoud's months-long campaign against Hammoud, these facts are more serious than those presented in the cases Jimmy's cites where courts found that plaintiffs had failed to establish a constructive discharge.[6]

---

[5] Indeed, in addition to being left off two straight schedules, the Amended Complaint includes other allegations suggesting that Jimmy's did not intend for Hammoud to return to work. On August 31, 2020, weeks after her suspension concluded, Hammoud was not invited to an all-bartender meeting, even though suspended bartenders customarily attended such meetings. (Am. Compl. ¶ 63).

[6] For this reason, Jimmy's contention that its actions could not constitute a constructive discharge because it invited Hammoud to work one shift with little notice on September 3, 2020, (see Mot. at 9–11), is unavailing. On top her other allegations, Hammoud was left out of work for over a month with no indication of when she might return. A reasonable person in Hammoud's position would find such a situation extremely distressing.

Jimmy's argument that Hammoud could not have perceived her workplace as intolerable because she did not quit after each incident that allegedly contributed to the constructive discharge, (see Mot. at 20), is similarly unpersuasive. A constructive discharge may be premised on a single event, but it may also occur because an accumulation of events, taken together, rendered a workplace intolerable. Thus, while some particular event

The Court finds that these allegations give rise to a plausible inference that a reasonable individual subjected to this treatment over a period of several months could find the conditions intolerable and feel compelled to resign. Accordingly, the Court finds that Hammoud has plausibly alleged that Jimmy's constructively discharged her.

> ### b.  Suspension

While Jimmy's superficially argues that Hammoud's suspension did not constitute a materially adverse action, (see Mot. at 15–16), the substance of the argument instead appears to argue that Jimmy's had a legitimate, non-discriminatory reason for the suspension. To avoid any confusion, however, the Court notes that an unpaid suspension may constitute an adverse action for the purposes of a discrimination or retaliation claim. See Cont'l Airlines, Inc. v. Admin. Review Bd., 638 F.App'x 283, 288 (5th Cir. 2016) (finding that a two-week suspension without pay was an adverse employment action because "suspension without pay is a way to dissuade employees from engaging in protected conduct"). Accordingly, the Court finds that Hammoud's two-week suspension may serve as an adverse action for all five counts.[7]

---

may have served as a tipping point, that does not render each preceding event irrelevant in the context of the constructive discharge analysis.

[7] As to Jimmy's specific contention that Hammoud's allegations were "conclusory" when she asserted that the reasons for her suspension were pretextual, (see Mot. at 15), the Court disagrees. Hammoud provided specific explanations for why the reasons for her suspension were meritless. (See Am. Compl. ¶ 55). Jimmy's may disagree with those assertions, but at the pleading stage, they suffice to support Hammoud's argument that Jimmy's reasons for suspending Hammoud were pretextual.

### c.    Hostile Work Environment

While a hostile work environment is often conceptualized as a subset of claims under workplace protection statutes, at its core, it is a form of adverse action—a series of actions that, collectively, alter the terms and conditions of an individual's employment. As a result, the Court will analyze Hammoud's claims of hostile work environment within this section.

In stating her hostile work environment claim, Hammoud relies on many of the same facts that form the basis for her allegation of constructive discharge. This is appropriate. See Evans, 936 F.3d at 191–92 ("[T]he Supreme Court . . . has recognized such a combined hostile work environment constructive discharge claim referred to as a 'hostile-environment constructive discharge' claim." (citing Suders, 542 U.S. at 147)). "To establish a hostile-environment constructive discharge claim, a plaintiff must show the requirements of both a hostile work environment and a constructive discharge claim." Id. at 192. The Court has already found that Hammoud has adequately alleged a constructive discharge claim. Accordingly, the Court turns to the elements of a hostile work environment.

To establish a discriminatory hostile work environment claim, Hammoud must demonstrate: "(1) she experienced unwelcome harassment; (2) the harassment was based on her [sex or religion]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Evans, 936 F.3d at 192.

Of course, the nature of El Seoud's alleged harassment—which repeatedly and explicitly referenced Hammoud's purported failures as a Muslim woman—makes clear that the harassment was based on her sex and religion. Further, because the Court finds that Hammoud has adequately pleaded the adverse action of constructive discharge sufficient to survive Jimmy's' Motion, it follows that she has adequately alleged that she experienced harassment that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. See Evans, 936 F.3d at 193 (noting that to establish a constructive discharge, "the plaintiff must show 'something more' than the showing required for a hostile work environment claim" (quoting Suders, 542 U.S. at 147)). In other words, Hammoud's allegations establishing a constructive discharge are more than enough to allege conduct that is sufficiently severe or pervasive to constitute a hostile work environment.[8]

Jimmy's argues separately that Hammoud has failed to allege facts sufficient to establish that the harassment was unwelcome. (See Mot. at 25–26). In support of this argument, Jimmy's notes that the Amended Complaint does not mention the word

---

[8] The Court notes that Hammoud has alleged actions in support of her claim of a discriminatory hostile work environment that may not relate directly to her claim of constructive discharge. This Opinion should not be read to revise the Amended Complaint by narrowing Hammoud's hostile work environment claim to only a hostile-environment constructive discharge claim. The Court reads the Amended Complaint to allege both a hostile work environment and a constructive discharge claim. Indeed, it is possible that Hammoud will ultimately prevail on her hostile work environment claim while being unable to adduce evidence to meet the higher bar of constructive discharge. At the motion to dismiss stage, however, the Court's finding that Hammoud has presented sufficient allegations to make out a claim of constructive discharge is dispositive as to whether she has alleged severe or pervasive harassment for the purposes of her hostile work environment claim.

"unwelcome." But as the Fourth Circuit has repeatedly held, an employee can demonstrate that conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer. See, e.g., E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009). Thus, "[t]he repeated complaints of Plaintiff (and her sister) demonstrate that the harassment seemed severe and pervasive to Plaintiff personally, as well as unwelcome." (Pl.'s Mem. Opp'n Def.'s Mot. Dismiss First Am. Compl. ["Opp'n"] at 22, ECF No. 25).

### 3.    Comparator Allegations

Jimmy's next argues that Hammoud's disparate treatment discrimination claims cannot prevail because she has not identified similarly situated, non-Muslim women comparators. (Mot. at 22–25). A plaintiff may establish a disparate treatment Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)).

As an initial matter, Hammoud alleges direct evidence of discrimination: El Seoud repeatedly criticized her and Dania based on the fact that they were behaving improperly as Muslim women. (See, e.g., Am. Compl. ¶¶ 13, 15–16, 23, 27, 29). Accordingly, Hammoud is under no obligation to include allegations of similarly situated comparators.

Assuming arguendo that Hammoud did not rely on direct evidence of discrimination, the Court would evaluate her claims under the burden-shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To establish a discrimination claim under the McDonnell Douglas burden-shifting

framework, Hammoud must <u>eventually</u> put forth a prima facie case of discrimination by establishing that "(1) [s]he belongs to a protected class; (2) [s]he suffered an adverse employment action; (3) at the time of the adverse action, [s]he was performing [her] job at a level that met [her] employer's legitimate expectations and was qualified for the promotion; and (4) [s]he was rejected under circumstances giving rise to an inference of unlawful discrimination." <u>Adams v. Trs. of the Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011); <u>see</u> <u>McDonnell Douglas</u>, 411 U.S. at 802.

The fourth element can be met by showing that "similarly-situated employees outside the protected class received more favorable treatment." <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004). Employees are similarly situated when they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Haywood v. Locke</u>, 387 F.App'x 355, 359 (4th Cir. 2010) (quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)).

In an employment discrimination action, however, "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002). Thus, a plaintiff need not plead facts that constitute a prima facie case to survive a motion to dismiss. <u>Bing v. Brivo Sys., LLC</u>, 959 F.3d 605, 616 (4th Cir. 2020). The factual allegations must only be sufficient "to satisfy the elements of a cause of action created by" Title VII, <u>McCleary-Evans v. Md. Dep't of Transp.</u>, 780 F.3d 582, 585 (4th Cir. 2015), and raise the plaintiff's "right to relief above the speculative level," <u>Coleman</u>

v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). Ultimately, a plaintiff must show that the employer took an adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Thus, an employment discrimination plaintiff "is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a . . . discrimination claim." Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 (4th Cir. 2003). Moreover, questions about the suitability of comparators "are inherently fact-based and should not be resolved at the pleadings stage where [Plaintiff] has alleged enough facts to permit a plausible inference that" she experienced discrimination. Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty., No. TDC-18-3821, 2019 WL 2929025, at *15 (D.Md. July 8, 2019); see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (holding that "the question whether two employees are similarly situated is a question of fact for the jury"); Subasic v. Sharon Reg'l Health Sys., No. 2:15-CV-1477, 2016 WL 861122, at *3 (W.D.Pa. Mar. 7, 2016) ("Whether or not the [employees outside Plaintiff's protected class] were working in another department or division . . . , or whether that is even relevant to the inquiry, raises factual questions as to whether they are, in fact, similarly situated, which cannot be resolved at the motion to dismiss stage.").

As set forth above, Hammoud alleges direct evidence of discrimination. Accordingly, she need not include comparator allegations to survive a motion to dismiss. In any event, such allegations are not necessary to survive a motion to dismiss where a plaintiff has introduced other indicia of discrimination. Finally, even if Hammoud were

required to introduce such evidence, the Court finds that Hammoud has adequately alleged the presence of similarly situated, non-Muslim women comparators for the purpose of surviving a Rule 12(b)(6) Motion. (See, e.g., Am. Compl. ¶¶ 21, 25, 26, 31–32, 39–40, 42, 44, 47–51, 57, 64). So, the Court rejects Jimmy's argument that Hammoud's claims of disparate treatment discrimination must fail because she does not provide allegations of similarly situated, non-Muslim women comparators who were treated differently.

### 4.    Imputable Conduct

Jimmy's next argues that the Court must dismiss Hammoud's discrimination claims because she has failed to include allegations that any discriminatory conduct by El Seoud or others is imputable to Jimmy's. See Rachel-Smith v. FTData, Inc., 247 F.Supp.2d 734, 749 (D.Md. 2003) (requiring that plaintiffs alleging hostile work environment claims include "some basis . . . for imputing liability to the employer"). This argument fails for several reasons.

A hostile work environment may be imputed to a defendant if the plaintiff engaged in protected activity sufficient to put the defendant on notice of a violation of Title VII and the defendant did not "respond with remedial action." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008). While Jimmy's argument is somewhat unclear, it appears to suggest that Hammoud made only general complaints about El Seoud's inappropriate behavior, and the allegations therefore do not "lead to the inference that [Jimmy's] would have understood [her] complaint to be about unlawful employment practices." Parker v. Ciena Corp., 787 F.App'x 817, 820 (4th Cir. 2019). The Court disagrees. As early as October 2019, Hammoud complained to her second-level supervisor

that El Seoud was targeting her and Dania because they were Muslim women. (See Am. Compl. ¶ 23).

Once Hammoud notified Jimmy's of her belief that the root of El Seoud's harassment was discriminatory animus, Jimmy's could reasonably infer that any subsequent complaint about El Seoud's behavior presumptively arose from that same animus. There is no requirement that during each subsequent complaint about El Seoud's behavior, Hammoud include the phrase, "and it was because I was a Muslim woman." Such an onerous requirement would not "comport[] with the broader purpose of Title VII as a 'remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.'" Stewart v. Iancu, 912 F.3d 693, 703 (4th Cir. 2019) (quoting Sydnor v. Fairfax Cnty., 681 F.3d 591, 594 (4th Cir. 2012)); see also Puryear v. Cnty. of Roanoke, 214 F.3d 514, 522 (4th Cir. 2000) ("Because Title VII . . . [is a] remedial statute[], courts must construe the legislation broadly to effect its purposes."). Indeed, such an "overly technical concern[]" could constitute a "tripwire for hapless plaintiffs." Sydnor, 681 F.3d at 594. In any event, even if Hammoud could only engage in Title VII-protected activity via statements in which she expressly mentioned that El Seoud's actions were rooted in discriminatory animus, she alleges that she did so multiple times after October 2019, including as late as July 20, 2020. (See, e.g., Am. Compl. ¶¶ 50, 52).

Second, because El Seoud was Hammoud's supervisor, Hammoud did not have to notify other supervisors to impute liability to Jimmy's. In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reemployment.

Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. For purposes of the employer's vicarious liability, the harasser qualifies as a supervisor, rather than a co-worker, "if he or she is empowered by the employer to take tangible employment actions against the [employee]." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). Hammoud clearly alleges El Seoud had authority to take tangible employment actions against Hammoud. (Am. Compl. ¶ 11). Nonetheless, Jimmy's makes no effort in its Motion or Reply to establish a Faragher/Ellerth defense. Accordingly, Jimmy's is vicariously liable for El Seoud's discriminatory or retaliatory actions.

Lastly, "an employer may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 334 (4th Cir. 2003). Hammoud alleges that she "was never provided any type of non-discrimination, retaliation, anti-harassment policies or complaint procedures at any time during her employment."

23

(Am. Compl. ¶ 9). This alleged absence of any procedures for handling claims of discrimination or harassment is sufficient at the pleading stage to impute constructive knowledge of El Seoud's conduct to Jimmy's. For all these reasons, the Court declines to dismiss any of Hammoud's claims on the basis that El Seoud's actions are not imputable to Jimmy's.

### 5.   Retaliation Claim

Hammoud alleges that Jimmy's unlawfully retaliated against her in violation of Title VII. Jimmy's argues that Hammoud's retaliation claim must fail for three reasons: (a) Hammoud did not engage in Title VII-protected activity; (b) Hammoud does not introduce plausible allegations of causation; and (c) Hammoud does not allege that she suffered an adverse action. At bottom, the Court disagrees with all three arguments and will decline to dismiss Hammoud's retaliation claim.

To state a claim for retaliation under Title VII, a plaintiff must allege "(1) that she engaged in a protected activity," as well as "(2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005)). An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." James, 368 F.3d at 375 (internal quotation marks and citation omitted). In retaliation cases, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). Thus, the burden of establishing an adverse action in a retaliation claim is lower than that of discrimination. <u>See</u> <u>id.</u> at 64–67 ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment. . . . The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").

Hammoud's retaliation claim is straightforward. She engaged in archetypal protected activity when she complained about El Seoud's discriminatory behavior. (<u>See</u> Am. Compl. ¶¶ 23, 50, 52);[9] <u>see also</u> <u>Strothers v. City of Laurel</u>, 895 F.3d 317, 328 (4th Cir. 2018) (finding that protected activity under Title VII includes "complaining to superiors about suspected violations of Title VII" (quoting <u>Boyer-Liberto</u>, 786 F.3d at 281)). She suffered an adverse action when Jimmy's allegedly subjected her to a retaliatory hostile work environment and then constructively discharged her. <u>See</u> <u>Vedula v. Azar</u>, No. TDC-18-0386, 2020 WL 5500279, at *15 (D.Md. Sept. 11, 2020) ("[T]o prove a retaliatory hostile workplace environment, the plaintiff must show the same elements [as a discriminatory hostile work environment claim] but demonstrate that the harassment was based on prior protected activity." (citing <u>Pueschel v. Peters</u>, 577 F.3d 558, 565 (4th Cir.

---

[9] As set forth <u>supra</u> in Section II.B.1, Jimmy's argument that the Court may not consider protected activity that occurred prior to January or February 2020, (<u>see</u> Mot. at 28), is incorrect.

2009))); (see also supra Section II.B.2). Thus, Hammoud need only plausibly allege a causal connection between the protected activity and the adverse actions she experienced.

"[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'" Jenkins v. Gaylord Ent. Co., 840 F.Supp.2d 873, 881 (D.Md. 2012) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001)). Jimmy's argues that the temporal proximity is insufficient here because Hammoud "first engaged in protected activity in May 2020, but she does not allege any potentially materially adverse action until August 2, 2020." (Mot. at 30). But Hammoud alleges that she engaged in protected activity as late as July 20, 2020, just two weeks before her suspension. (See Am. Compl. ¶¶ 50, 52). The temporal proximity between this protected activity and the adverse employment actions she alleges is "very close." See Breeden, 532 U.S. at 273–74. Accordingly, the Court declines to dismiss Hammoud's retaliation claim.

### III.   CONCLUSION

For the foregoing reasons, the Court will deny Jimmy's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 20). A separate Order follows.

Entered this 1st day of August, 2022.

_____/s/_____

George L. Russell, III
United States District Judge
