**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

LAMA HAMMOUD                                    *

     Plaintiff,                                  *                    Civil Action: MJM-21-1593

v.                                              *

JIMMY'S SEAFOOD, INC.                           *

     Defendant.                                  *

           * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Lama Hammoud ("Plaintiff") commenced this civil action against Defendant Jimmy's Seafood, Inc. ("Defendant") alleging employment discrimination and harassment based on religion and sex, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq*. Currently pending are Defendant's Motion for Summary Judgment (ECF 62) and Motion to Strike (ECF 73). Defendant requests summary judgment on all claims and moves to strike portions of Plaintiff's response to the Motion for Summary Judgment. Plaintiff opposes both motions. The motions are fully briefed and ripe for disposition. No hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the motions will be granted in part and denied in part.

## I.     FACTUAL BACKGROUND

Defendant operates Jimmy's Famous Seafood (the "Restaurant"), a restaurant in Dundalk, Maryland. Plaintiff was employed by Defendant during two separate time periods: the first from October 2015 to February 2018, and the second from February 2019 to August or September

2020.[1] Pl. Dep., Def. Exh. 4, ECF 62-6, at 136:11–19, 142:21–143:2, 143:20–144:2, 154:1–6. Plaintiff makes no allegations of unlawful discrimination or retaliation during her first period of employment. *Id.* at 145:15–17.

Plaintiff worked primarily as a server at the Restaurant but would also work shifts as a bartender from around September 2019 to the end of her second period of employment *Id.* at 148:7–16. Plaintiff's younger sister, Dania Hammoud ("Dania"), came on as a bartender in or about October 2019. The Hammoud sisters are Muslim. *Id.* at 222:17; Dania Decl., Pl. Exh. 2, ECF 70-3, ¶ 2. Plaintiff states in her declaration that she does not believe that any other bartender, server, or food truck worker (besides herself and Dania) identified as Arab or Muslim during her time at Restaurant. Pl. Decl., Pl. Exh. 9, ECF 70-12, ¶ 24.

Saad Abou El Seoud, also known as "Habibi," had worked at Restaurant since 1996. El Seoud Dep., Def. Exh. 3, ECF 62-5, at 9:4–8. El Seoud is Muslim. *Id.* at 24:13–14. During the relevant period, El Seoud was employed as a kitchen manager, *id.* at 13:9–20, but was known to be present throughout Restaurant, *see* Coleman Dep., Pl. Exh. 5, ECF 70-9, at 31:12–32:5 ("I never seen [sic] [El Seoud] like just in the kitchen."); Ritz Dep., Pl. Exh. 6, ECF 70-10, at 38:9–18 ("[El Seoud] was all over the place."). The dining room and back bar would close sometime between 9:00 p.m. and 11:00 p.m., but the kitchen would remain open until 12:00 a.m., and the front bar would close around 2:00 a.m. Parker Dep., Pl. Exh. 4, ECF 70-8, at 23:14–24:3; Ritz. Dep., ECF 70-10, at 121:6–10. El Seoud was often the only manager on duty after midnight and typically would close the front bar and let the bartenders know when they could leave. Pl. Dep, Pl. Exh. 1,

---

[1] The precise end date for Plaintiff's second period of employment is in dispute. Plaintiff testified at her deposition that Defendant constructively discharged her on August 26, 2020, when she was locked out of the electronic work schedule following a two-week suspension. Pl. Dep., ECF 62-6, at 340:21–341:1, 341:4–8. Defendant maintains that Plaintiff abandoned her job when she failed to reply to a manager's offer to return to work on September 3, 2020. Def. Exh. 33, ECF 62-35.

ECF 70-2, at 491:7–17; Coleman Dep., ECF 62-12, at 35:18–36:2; Ritz. Dep, ECF 70-10, at 128:4–10; El Seoud Dep., ECF 62-5, at 35:8–20. El Seoud was viewed as a person of authority by servers and bartenders. Several of them testified that he would give them orders and work assignments. Dania Decl., ECF 70-3, ¶ 6; Coleman Dep., ECF 70-9, at 118:18–119:12; Ritz Dep., ECF 70-10, at 126:17–127:9. Individuals in management testified that El Seoud could not assign bartenders tasks but was there to assure they complied with a pre-written checklist. J. Minadakis Dep., Def. Exh. 2, ECF 62-4, at 31:1–33:11; Singh Dep., Def. Exh. 14, ECF 62-16, at 30:2–13.

### A. Pre-Pandemic Period: September 2019 to March 2020

Plaintiff testified that she began suffering harassment by El Seoud when she and Dania started bartending at the Restaurant in the fall of 2019, in large part because the role involved serving alcohol and interacting with male customers at the bar. Pl. Dep., ECF 70-2, at 223:1–2. El Seoud would tell Plaintiff that she was "not a good Muslim" for drinking and serving alcoholic beverages, and that Muslim women should not be tending bar or "talking to guys." Pl. Dep., ECF 70-2, at 302:13–19, 303:14–20, 305:12–15. Plaintiff testified that she would rarely stay after her shift to have a drink, but when she did, El Seoud would go out of his way to make her feel uncomfortable. *Id.* at 306:12–16. According to Plaintiff, El Seoud expressed disapproval of Plaintiff or Dania wearing tight clothing and showing skin, even though their attire complied with the Restaurant's dress code. *Id.* at 305:21–306:11; Dania Decl., ECF 70-3, ¶ 12. El Seoud did not make such comments to or about other female bartenders at the Restaurant. Dania Decl., ECF 70-3, ¶ 12.

El Seoud once told Dania that her mother had done a bad job raising her and Plaintiff, that he could not believe she would allow her Muslim daughters to become bartenders, and that they

3

should have been raised by their father.[2] Dania Decl., ECF 70-3, ¶ 4. As with Plaintiff, El Seoud would tell Dania that she was "not Muslim" for showing skin, drinking, tending bar, and speaking to men. He would also shame her for having a tattoo, telling her that it was improper for Muslims to have tattoos. *Id.* On one occasion, Dania remarked to El Seoud that she spoke Arabic well, and he replied that it did not matter because she and Plaintiff "weren't Muslim." *Id.*

According to Plaintiff and Dania, El Seoud would often stare at them in an angry and uncomfortable manner during their shifts. Pl. Dep., ECF 70-2, at 224:13–21, 243:13–244:9, 380:9–385:3; Dania Decl., ECF 70-3, ¶¶ 6, 9. Other bartenders testified to having seen El Seoud stare at Plaintiff and Dania for long periods of time while they worked. Coleman Dep., ECF 70-9, at 64:21–65:6; Ritz. Dep., ECF 70-10, at 57:5–58:8. For example, Jayda Coleman, a female bartender, testified that El Seoud would sometimes stand in place and stare at Plaintiff and Dania for twenty or thirty minutes at a time and that if this had been done to her, she would have found it "very weird and uncomfortable." Coleman Dep., ECF 70-9, at 124:21–125:10.

Plaintiff and Dania claim that El Seoud would single them out and require them—and only them—to perform extra tasks when closing the bar. Pl. Dep., ECF 70-2, at 160:13–161:14; Dania Decl., ECF 70-3, ¶ 6. At least once, he required Plaintiff to stand on top of the bar and the tables and dust and wipe down the lamps and windowsills before she could leave. Pl. Dep., ECF 70-2, at 159:2–161:17, 235:3–236:2; Ritz Dep., ECF 70-10, at 54:5–56:14, 134:10–20, 144:3–18.

El Seoud disputes Plaintiff's allegations about his behavior toward her and Dania, testifying at his deposition that he never stared at either of them and never made any comments to them about religion, drinking, talking to men, serving as bartenders, or their outfits. El Seoud Dep., Pl. Exh. 3, ECF 70-7, at 61:13–68:21. However, Defendant does not dispute certain portions of

---

[2] According to Dania, when she first met El Seoud, he told her he had known her as a baby because he used to know her father. Dania Decl., ECF 70-3, ¶¶ 3–4.

Plaintiff's testimony about El Seoud's behavior and comments for purposes of its summary judgment motion. *See* Def. Mem., ECF 62-2, at 4 n.1, 7 n.5, 8 n.7, 29–30.

On the night of December 17, 2019, Plaintiff worked a shift at the front bar, while a charity banquet was held on the second floor of the Restaurant. Dania Decl., ECF 70-3, ¶ 8. Dania attended the event as a guest, as did certain other Restaurant employees and managers, and was drinking at the event. *Id.* According to Dania, El Seoud frequently came upstairs from the kitchen during the event to stare at her and made several comments to her about her drinking. *Id.* He eventually yelled at Dania to come downstairs, where they had an argument in Arabic. *Id.* El Seoud did not shout at anyone else attending the event, nor did he make any comments about their drinking alcohol. *Id.* Jessica Ritz, a bartender, testified that when she asked El Seoud that night why he was so upset, he told her Dania had been drinking too much and that "she [was] a disgrace to [Islam]." Ritz. Dep., ECF 70-10, at 44:12–46:14.

After the banquet was over, Dania sat at the front bar where Plaintiff was working. Dania continued drinking and talked with some of her male friends. Dania Decl., ECF 70-3, ¶ 9. El Seoud became angry and proceeded to stand around the bar and glare at the Hammoud sisters for much of the night. *Id.* At the end of Plaintiff's shift, El Seoud loudly accused her of pouring free drinks for her friends and directed her to dig through the trash for paper receipts for the drinks she served. Pl. Dep., ECF 70-2, at 223:12–224:18. Although there was another bartender on shift, El Seoud did not yell at her or require her to go through the trash. *Id.* Plaintiff testified that she called Amber Kraus, a bartender and manager-in-training who had already left for the night, to return to the Restaurant to help calm El Seoud down. *Id.* at 515:4–6. Kraus used her credentials to log into the computer system and show El Seoud electronic receipts for the drinks. *Id.* at 515:2–5. El Seoud assigned Plaintiff several extra tasks before he would allow her to leave, and she did not get home

until around 3:00 a.m.—long after the other bartender working the same shift had left. *Id.* at 515:11–516:20. When Plaintiff finally arrived at home that morning, she sat in her car and cried. Pl. Decl., ECF 70-12, ¶ 6.[3]

On December 18, 2020, at 3:25 a.m., Plaintiff texted Kraus to thank her for helping with El Seoud. Def. Exh. 18, ECF 62-20. At 9:51 a.m., Kraus replied, apologizing for El Seoud's behavior and describing it as "uncalled for." *Id.* Plaintiff told Kraus that she would be speaking with Kenny Hadel, Restaurant manager, about the incident with El Seoud. When Kraus asked why El Seoud went after her in the first place, Plaintiff sent several messages in response:

> He was angry with Dania last night and took it out on me so he was being an asshole on purpose. Habibi takes everything we do personal, when I say everything I mean he's made comments about us drinking, bartending, danias tattoo… things like that bc were [sic] the same religion. So he's become super judgey since Iv [sic] been behind the bar. He stood and stared at Dania for the last 1 and half [hours] when everyone came down last night. Idc what Habibi thinks and what he believes in, we're different people than him so he needs to fuck off and mind his own business. What Dania and I do regarding our religion and what are we isn't his fucking business. He's even made comment to Dania once talking about my mom. I don't say anything when Dania comes to me bc I'm not making it a big deal. But when he starts to sabotage its [sic] going to become a problem. A DISCRIMINATORY PROBLEM!!

*Id.* Kraus did not send any message in response. *Id.* Later that morning, Plaintiff texted Hadel that she needed to speak with him "today please!!" and that she would be in the "back bar at 5." Pl. Exh. 9-D, ECF 70-16.

On the same date, Hadel asked Dania to tell him what was going on with Plaintiff. Dania Decl., ECF 70-3, ¶ 10. Dania told Hadel that El Seoud was angry at the Hammoud sisters for being

---

[3] Kraus testified in her deposition that El Seoud was not angry when she returned to the bar and that Plaintiff only called her to help look for a receipt—not to calm El Seoud down. Kraus. Dep., Def. Exh. 7, ECF 62-9, at 70:17–71:17.

bartenders and for drinking, and that El Seoud had "yelled at [Plaintiff] badly" the night before. *Id.* Dania told Hadel that El Seoud resented her and Plaintiff for not being as strict with their faith as he was and that he behaved harshly toward them and constantly told them they were bad Muslims. *Id.* Hadel apologized and said he would speak to El Seoud about his behavior. *Id.*

Later that day, after Plaintiff arrived for her shift, she spoke with Hadel about the events of the night prior and El Seoud's treatment of her. Pl. Dep., ECF 70-2, at 521:18–522:5. In an affidavit, Hadel denies that this conversation happened, Hadel Aff., Def. Exh. 13, ECF 62-15, ¶¶ 5, 7, but Defendant stipulates that the conversation occurred for purposes of the summary judgment motion. ECF 62-2 at 9 n.9.

One night in January 2020, Plaintiff got into an argument with another server. Dania Decl., ECF 70-3, ¶ 11. El Seoud came into the dining room where the two were arguing and told Plaintiff to shut up. *Id.* He then compared Plaintiff to a rabbit and told the other server to "stomp on her" the next time they got into an argument. *Id.* Another night in January, while Plaintiff and Dania were working as bartenders, El Seoud yelled at Plaintiff and Dania for wearing the Restaurant's bartender uniform. *Id.* ¶ 12.

Shannon Boyle, another employee, testified that she once heard El Seoud criticize Plaintiff and Dania for dressing inappropriately, even though they wore the standard bartender uniform and El Seoud never commented on how other bartenders dressed. Boyle Dep., ECF 70-22, at 102:10–104:6. On another occasion, Boyle overheard Plaintiff and Dania complain to Stephanie Forgrave, a manager, about El Seoud, and Forgrave said she would talk to El Seoud about his behavior. *Id.* According to Boyle, Plaintiff and Dania would complain about El Seoud "to everyone." *Id.* at 100:3–8. Forgrave, for her part, denied that Plaintiff ever complained about religious

discrimination from El Seoud and testified that everyone complained about El Seoud because he was "annoying." Forgrave Dep., Exh. 8, ECF 62-10, at 73:19–74:7.

### B. Pandemic Period: March 2020 to May 2020

In March 2020, all indoor dining in the State of Maryland was shut down due to the COVID-19 pandemic. J. Minadakis Dep., ECF 62-4, at 62:11–63:4. To keep the Restaurant in business, Defendant operated a carryout service and ran food trucks beginning in late March 2020. *Id.* at 64:1–9. Bartenders and servers were re-assigned to work carryout and food truck shifts. *Id.* at 65:13–67:13.

Ramadan was observed by Muslims between late April and late May 2020. Plaintiff testified that, on at least three occasions during Ramadan, El Seoud asked Plaintiff if she was fasting, or remarked that she was not fasting, in order "to make [her] feel bad." Pl. Dep., ECF 70-2 at 227:4–9, 302:1–12, 329:20–332:4. Following a food truck shift in May 2020, one of the managers gave Plaintiff and some other employees a bag of alcoholic iced tea to drink because it had a tear and was unsalable. Pl. Decl., ECF 70-12, ¶ 9. When El Seoud saw this, he snatched the bag away from Plaintiff and threw it out while glaring at her. *Id.*

On numerous occasions at the end of Plaintiff's shift, El Seoud would yell at Plaintiff to clock out and accuse her of stealing hours, while ignoring other bartenders and servers. Pl. Dep., ECF 70-2, at 207:9–208:3, 211:9–13. After a food truck shift in May 2020, El Seoud screamed at Plaintiff and threatened to fire her if she did not clock out, while ignoring several other employees, including Coleman. *Id.* at 210:6–14. This incident occurred in front of customers. *Id.* at 207:9–208:13. Other times, El Seoud would demand to check Plaintiff's and Dania's bags before they could leave, but he did not check the bags of other servers and bartenders. *Id.* at 373:5–379:13; Dania Decl., ECF 70-3, ¶ 22; Boyle Dep., ECF 70-22, at 61:20–62:7.

In late May 2020, Defendant opened an outdoor dining area in the Restaurant's parking lot called the "Crab Garden." J. Minadakis Dep., ECF 62-4, at 64:16–20. The dining area consisted of a main bar surrounded by various sections of guest tables. Dania Decl., ECF 70-3, ¶ 14.  Because there was only one bar in operation during this period, Plaintiff worked primarily as a server for the remainder of her employment at the Restaurant. Def. Exh. 12, ECF 62-14; Def. Exh. 19, ECF 62-21.

### C. New Management: June and July 2020

Longtime manager Kenny Hadel resigned from the Restaurant in mid-June 2020 and was replaced by B.J. Parker,[4] Amber Kraus, and Rachel Paulino[5] as co-managers with equal authority. Parker Dep., ECF 62-12, at 11:12–12:18. Plaintiff claims that she and Dania were unfairly targeted by the new management.

The Hammoud sisters both began receiving complaints from management that the shorts they wore to work were too revealing. Pl. Dep., ECF 70-3 at 285, 390; Dania Decl., ECF 70-3, ¶ 15; Pl. Decl., ECF 70-12, ¶ 12. Other female servers and bartenders wore shorts of the same length, including on the Restaurant's social media pages. Pl. Exh. 2-A, ECF 70-4. In response to the complaints, Plaintiff and Dania obtained and wore longer shorts to avoid confrontation with management. Dania Decl., ECF 70-3, ¶ 15; Pl. Decl., ECF 70-12, ¶ 12. Nonetheless, Dania continued to receive complaints about the length of her shorts. Dania Decl., ECF 70-3, ¶¶ 15–16. When Dania told Kraus that her shorts were identical to those of another female server who had not been receiving such complaints, she replied that one of the managers had been making complaints about the length of her and Plaintiff's shorts but declined to give a name. *Id.* ¶ 16.

---

[4] B.J. Parker is identified as Robert Parker in his deposition transcript. Parker Dep., ECF 62-12, 70-8.

[5] Rachel Paulino is referred to as "Rachel Paulson" in Plaintiff's briefs. ECF 70.

Restaurant co-owner John Minadakis ("John") testified that he received multiple guest complaints specifically about the length of Dania's shorts. J. Minadakis Dep., ECF 62-4, at 87:19–88:18, 97:10–98:8 ("Somebody pulled me to the side and said, hey, man, I'm here with my family and not to see that.").

Plaintiff's failure to appear for her shifts on time also became an issue for the new management. She testified that she had an unwritten agreement with Hadel that she would sometimes be late to work because of her primary job, but she never spoke to the new management about it because she believed they knew about her other job. Pl. Dep., ECF 70-2, at 177:17–180:8. Other bartenders and servers worked second jobs, and they were accommodated when those jobs resulted in scheduling conflicts with the Restaurant. Ritz. Dep., ECF 70-10, at 119:1–120:13; Boyle Dep., ECF 70-22, at 96:8–98:13. Paulino would send Plaintiff messages asking where she was at the start of her shifts, even though, according to Plaintiff, Paulino knew or should have known that Plaintiff was working at her other job. Pl. Dep., ECF 70-2, at 175:18–176:15. Defendant has submitted as exhibits copies of several text messages from Plaintiff apologizing or making excuses for being late to her shifts at the food truck and Crab Garden from May through July 2020. Def. Exh. 20, ECF 62-22; Def. Exh. 21, ECF 62-23; Def. Exh. 22, ECF 62-24; Def. Exh. 23, ECF 62-25; Def. Exh. 24, ECF 62-26; Def. Exh. 25, ECF 62-27.

On July 20, 2020, Restaurant co-owner Tony Minadakis ("Tony") told Plaintiff and Dania that Parker had described them as "against management" during a manager's meeting earlier that day. Dania Decl., ECF 70-3, ¶ 17. Parker rejected the contention that he used the words "against

management" but confirmed that he described the Hammoud sisters as "often late, out of uniform,[6] . . . combative." Parker Dep., ECF 62-12, at 63:12–64:11.

That night, Plaintiff texted Kraus about her concerns that Paulino was targeting her. Pl. Dep., ECF 70-2, at 216:20–220:6; Def. Exh. 34, ECF 62-36. Kraus responded the next morning at 10:59 a.m., writing:

> I'm sorry i didnt reply last night but believe me i see it and understand. Did you tell tony nothing was said to you from [Paulino] or [Parker] about anything ? I know [Paulino] is a liar believe me. She talks shit about me every day lol but don't let it ruin your time here. Use [Parker] instead of her and text him with any issues with her[.]

Def. Exh. 34, ECF 62-36. To this, Plaintiff replied:

> I will talk to [Parker] when I see him next. I just don't understand where me going "against them" came from when I never had an issue with neither of them. Only thing I spoke on, was me being late and [Paulino] choosing her random days to text me where I'm at, as if stupid doesn't . . . .[7]

*Id.* Plaintiff admitted in her deposition that the foregoing text exchange was only about Paulino and not about El Seoud, stating, "I've complained to [Kraus] numerous times about Habibi [El Seoud], so I don't see the point in complaining about Habibi again." Pl. Dep., ECF 70-2, at 220:7–9. She further testified, however, that she saw Kraus in person that day and brought up the incident with El Seoud that occurred on December 17, 2019, and how his harassment had persisted. *Id.* at 219:16–220:9, 539:7–544:10.[8]

---

[6] Parker clarifies that he only remembers Dania, not Plaintiff, having issues with the uniform. Parker Dep., ECF 62-12, at 64:9–18.

[7] The rest of the text message is cut off in the exhibit; it is not clear how the message ends.

[8] Although Tony and Kraus dispute these events, Defendant stipulates to them for purposes of its summary judgment motion. Def. Mem., ECF 62-2, at 13 n.13.

That same day, on July 21, 2020, Paulino suspended Dania for accepting a shot from a customer during her shift, even though Forgrave approved the shot and other bartenders had also accepted a shot from the same group of customers. Dania Decl., ECF 70-3, ¶ 18.[9] On July 22, 2020, at 2:16 p.m., Dania sent Plaintiff a text message about what Tony said and that she was grateful for him. Pl. Exh. 2-B, ECF 70-5.

### D. Suspension and Termination of Employment: August and September 2020

Plaintiff was scheduled to work from 9:00 a.m. to 11:00 p.m. on August 2, 2020, Def. Exh. 12, 62-14 at 5, which would turn out to be her last day of employment at the Restaurant. She worked as a server that night for a section of tables in the Crab Garden. *Id.* According to John, there were four complaints about Plaintiff that night from three tables, J. Minadakis Dep., ECF 62-4, at 149:1–19, though Plaintiff disputes that there were any faults with her job performance.

One of the complaining customers was Samantha Breeden, a close friend of the Restaurant owners. Pl. Exh. 9-G, ECF 70-19; J. Minadakis Dep., ECF 62-4, at 127:14–128:21. Breeden complained that Plaintiff was "unfriendly," "generally unpleasant," and "disappeared for long periods of time," forcing Breeden to order her drinks from the bar. Breeden Aff., Def. Exh. 27, ECF 62-29, ¶¶ 4–5. When Breeden and her companion told Plaintiff that they had received the wrong orders and wanted to send their food back, Plaintiff "seemed annoyed." *Id.* ¶ 6. When Breeden, later in the night, asked for a meal to-go for her husband, Plaintiff brought out the wrong order, and on a plate instead of packaged for carry-out. *Id.* ¶ 7. Breeden told floor manager Gurvir Singh about her experience and was informed that "[she] was not the only guest to complain about

---

[9] Dania claims that Restaurant policy required bartenders to ask a manager for permission when a guest wanted to buy them a drink during their shift. Dania Decl., ECF 70-3, ¶ 13. According to Dania, El Seoud would never allow guests to buy drinks for her or Plaintiff but would "routinely" say yes for other bartenders. *Id.*

[Plaintiff's] service that evening." *Id.* ¶ 8. Breeden also spoke with John that night to let him know about Plaintiff's bad attitude. *Id.* Plaintiff disputes Breeden's complaints, claiming in her declaration she was attentive to Breeden's table and Breeden did not have to order drinks from the bar. Pl. Decl., ECF 70-12, ¶ 15. She disputes serving any wrong order, though a different employee brought out the to-go order on a plate, for which Plaintiff apologized. *Id.* ¶ 16.

Another complaint about Plaintiff's service that night involved a customer who was angry and "raised hell" after Plaintiff allegedly charged over $150 more than they should have paid, and on the wrong credit card. J. Minadakis Dep., ECF 62-4, at 162:4–21. Plaintiff explains in her declaration that she charged the correct amount to the correct credit card but another customer at the table wanted to pay. Pl. Decl., ECF 70-12, ¶ 18.

Singh exchanged text messages with John, Parker, and Paulino about the complaints. John decided to suspend Plaintiff's employment for two weeks, and the managers directed Singh to complete a disciplinary form for her. Def. Exh. 28, ECF 62-30. At the end of Plaintiff's shift, Singh took Plaintiff to an area in the back of the Restaurant and informed her that she had received multiple complaints that night and that she would be suspended for two weeks. Pl. Decl., ECF 70-12, ¶ 17; Singh Dep., ECF 62-16, at 109:17–110:8. Singh stated this decision was made by "all management" and presented Plaintiff with a disciplinary form. Pl. Decl., ECF 70-12, ¶ 17; Singh Dep., ECF 62-16, at 123:6–17, 134:13–135:7; J. Minadakis Dep., ECF 62-4, at 150:3–21. Plaintiff was required to sign the back side of the form but was never shown the front side, which she now claims contained a number of errors. Pl. Decl., ECF 70-12, ¶ 19.

Plaintiff contends that the two-week suspension was designed to force her out of employment with the Restaurant. She notes that, in the exchange of text messages between John, Parker, and Paulino, Parker wrote, "IF [sic] [Plaintiff] comes back, she lo [sic] be scheduled once

a week and she will quit." Def. Exh. 28, ECF 62-30, at 4. In another message, John wrote, "[m]y opinion Alex[10] skips training and takes over her shifts immediately[,]" and in a third, Parker wrote, "[i]nterviews are lined up this week too." *Id.*[11] Plaintiff claims she was never informed of any customer complaints in her years working at the Restaurant prior to the four complaints she received in one night on August 2, 2020. Pl. Decl., ECF 70-12, ¶¶ 3–4. She had received numerous positive reviews and often was asked by management to help train new servers.[12] *Id.* ¶¶ 2, 4.

Although Plaintiff was suspended for only two weeks, she was not scheduled to return to work on August 16, 2020, nor for the week thereafter. ECF 62-2 at 14; ECF 70 at 15. Plaintiff contends she was intentionally omitted from the schedule, noting that in her five years at the Restaurant, she had never seen another employee suspended for more than one week and that suspended employees were always put back on the schedule automatically without needing to communicate with management. Pl. Dep., ECF 70-2, at 61:8–66:14; Dania Decl., ECF 70-3, ¶ 19; Ritz Dep., ECF 70-10, at 126:2–16.

Plaintiff had lunch with Kraus on August 13, 2020, noting she was not on that week's work schedule, and Kraus told her she would speak to the other managers about it. Pl. Dep., ECF 70-2, at 100:9–13; Kraus Dep., ECF 62-9, at 37:1–5. Kraus testified that she did in fact bring Plaintiff's scheduling up at the next weekly manager's meeting but did not recall what came of it or what anyone said in response. Kraus Dep., ECF 62-9, at 39:1–40:19. On August 26, 2020, Plaintiff received a phone notification that the schedule for the upcoming week had been released, but when she went to check the schedule online, she discovered that she was locked out access to the

---

[10] Presumably, Alex was a recent hire.

[11] There is no indication that Plaintiff was aware of these text messages at the time.

[12] John testified that he received many customer complaints about Plaintiff's "lackadaisical attitude" during her first employment period (2015 to 2018). J. Minadakis Dep., ECF 62-4, at 100:10–20, 120:13–16 ("If I had to give [Plaintiff] a grade for her employment at Jimmy's, it would be a D minus.").

schedule entirely and was not able to log back in. Pl. Dep., ECF 70-2, at 61:12–62:4. Ritz testified that she was able to check the work schedule throughout her own suspension and did not lose access until the day after she gave notice of her resignation. Ritz Dep., ECF 70-10, at 130:8–132:5.

Ten days into Plaintiff's suspension, on August 12, 2020, Dania was suspended for the second time in the span of one month. Dania Decl., ECF 70-3, ¶ 19. This time, Parker suspended her for the length of her shorts and because she parked in a lot where she was not permitted to park. *See id.* Dania was automatically placed back on the work schedule at the end of her suspension. *Id.* After she returned to work, in mid-to-late August, El Seoud threatened to have her suspended again. *Id.* ¶ 20. When Dania went to Parker complain about the threat, she asked why Plaintiff had not been scheduled for work. *Id.* Parker told her that Plaintiff did not want to work at the Restaurant, noting that Plaintiff had a "real estate job" and that the managers felt Dania's work performance was better without Plaintiff around. *Id.* Dania shared these comments with Plaintiff. *Id.* Parker confirmed in his deposition that he did tell Dania that she was a better employee when Plaintiff was not there but clarified that he did not think either of them were ever "good employee[s]." Parker Dep., ECF 62-12, at 61:11–62:7.

On September 3, 2020, at 12:47 p.m., Parker texted Plaintiff to say he was not "sure what happened with [her] scheduling" but that she "should've been put back on," and asked if she could work as a server that night. Def. Exh. 31, ECF 62-33, at 1. Plaintiff responded at 6:16 p.m. that she was upset that she had lost a month's income, that she had been "looking forward to coming back," and that his saying he was "not sure what happened with [her] scheduling" was "not a good enough excuse for [her]." *Id.* at 2–3. Parker replied at 10:11 p.m., apologizing for the lack of communication in August and stating that Plaintiff could resume work at her "normal hours." *Id.* at 3–4. Plaintiff never responded. She testified at her deposition that she considered herself to have

been terminated from employment at the Restaurant and that she was no longer interested in working there after the debacle with her work schedule following her two-week suspension. Pl. Dep., ECF 62-6, at 340:21–341:1, 341:4–8. John testified that he would have wanted Plaintiff to return to work after her suspension "if her attitude changed." J. Minadakis Dep., ECF 62-4, at 159:5–8.

On September 9, 2020, Plaintiff emailed a manager to request a "proper reason why [she] was taken off work completely[,]" for purposes of filing a claim for unemployment benefits. Def. Exh. 32, ECF 62-34. Defendant's Human Resources Coordinator attempted to send an email the next day by email responding that Plaintiff was considered to have abandoned her job after failing to reply to Parker's offer on September 3, 2020, to return her to her normal hours. However, this email was returned as undelivered. *Id.*; Def. Exh. 33, ECF 62-35.

## II.  PROCEDURAL BACKGROUND

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on November 9, 2020, (ECF 20-3) and received her EEOC right-to-sue letter on March 31, 2021 (Am. Compl., ECF 13, ¶ 72). She then filed her initial Complaint in this Court on June 28, 2021 (ECF 1), to which Defendant filed its initial Motion to Dismiss (ECF 4).

On September 27, 2021, Plaintiff filed a five-count Amended Complaint alleging: religious discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count I); religious discrimination and harassment in violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.* ("MFEPA") (Count II); sex discrimination and harassment in violation of Title VII (Count III); sex discrimination and harassment in violation of MFEPA (Count IV); and retaliation in violation of Title VII (Count V). (Am. Compl., ECF 13, ¶¶ 74–106). Defendant filed a Motion to Dismiss

the Amended Complaint on November 22, 2021 (ECF 20), which Judge Russell denied in an Order

dated August 1, 2022 (ECF 30). Defendant filed its Answer on August 29, 2022 (ECF 33).

Following close of discovery, Defendant filed a Motion for Summary Judgment (ECF 62),

Plaintiff filed a response in opposition (ECF 70), and Defendant filed a reply (ECF 74). Defendant

also filed a Motion to Strike portions of Plaintiff's response (ECF 73), which Plaintiff opposed

(ECF 76), and Defendant replied (ECF 81). The case was subsequently transferred to the

undersigned.

## III.    MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

A court may grant a party's motion for summary judgment under Rule 56 if "the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020). "[T]he mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no genuine issue of material fact."

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis removed).

A fact is "material" if it "might affect the outcome of the suit under the governing law[,]"

and a "genuine" issue as to material fact exists "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* at 248; *see also Raynor v. Pugh*, 817 F.3d 123, 130

(4th Cir. 2016). A party can establish the absence or presence of a genuinely disputed fact through

"particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

17

The court must view the inferences to be drawn from the facts in the light most favorable to the nonmovant, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the court is not permitted to weigh the evidence, make credibility determinations, or decide the truth of disputed facts. *Anderson*, 477 U.S. at 249.

### B. Hostile Work Environment

Plaintiff asserts claims for discriminatory workplace harassment and hostile work environment based on unwelcome behavior by El Seoud during her second period of employment with Defendant, which she contends was both abusive and unlawfully based on her sex and religion. Am. Compl., ECF 13, ¶¶ 74–100; Pl. Opp'n, ECF 70, at 22–26, 30. Defendant argues that the incidents involving El Seoud did not rise to the level of "severe or pervasive," but were "isolated and remote" and therefore not actionable. Def. Mem., ECF 62-2 at 28–31; Def. Reply, ECF 74 at 12–14. Even if El Seoud's treatment of Plaintiff was "severe or pervasive," Defendant argues, El Seoud's conduct is not imputable to Defendant because he was not Plaintiff's supervisor. Def. Mem., ECF 62-2, at 31; Def. Reply, ECF 74 at 14–17.

"A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (cleaned up). A claim of hostile work environment under Title VII requires a showing of four elements: "(1) unwelcome conduct; (2) based on the plaintiff's [sex or religion] (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Id.* (citing *Okoli v. City of Baltimore*, 684 F.3d 216, 220 (4th Cir. 2011)); *see also Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). The MFEPA "is the

state law analogue of Title VII[,]" *Alexander v. Marriott Int'l, Inc.*, Civ. No. RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011) (citing *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 743 n. 8 (Md. 2007)), and, accordingly, imposes liability on employers for workplace harassment based on sex, religion, and other protected categories, *see* Md. Code. Ann., State Gov't §§ 20-601(h) (defining "harassment"), 20-611 (imposing liability on employers). Therefore, the Court will generally apply the standards for a Title VII hostile work environment claim to the merits of Plaintiff's workplace harassment claim under the MFEPA. *See Brown v. Bratton*, Civ. No. ELH-19-1450, 2020 WL 886142, at *26 (D. Md. Feb. 21, 2020) (applying Title VII standards to MFEPA claim); *Ensor v. Jenkins*, Civ. No. ELH-20-1266, 2021 WL 1139760, at *18 (D. Md. Mar. 25, 2021) ("[MFEPA] analysis tracks that of Title VII[.]").

    1.  Underlined Conduct

    Regarding the first element of a hostile work environment claim, an employee can show that she received unwelcome conduct by voicing her objections, whether to the harasser or to her employer. *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Establishing unwelcome conduct "is not a high hurdle." *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018).

    Plaintiff has presented more than enough evidence to create a genuine dispute that El Seoud engaged in unwelcome conduct toward her. Deposition testimony and sworn declarations in the record show various forms of harassing conduct by El Seoud. He insulted and criticized Plaintiff, sometimes yelling at her, for not being "a good Muslim," for serving and consuming alcoholic beverages, for speaking with men, and for her attire. Pl. Dep., ECF 70-2, at 226:2–27:3, 302:13–19, 303:14–20, 305:12–15; Dania Decl., ECF 70-3, ¶¶ 4, 12; Boyle Dep., ECF 70-22, at 102:10–104:6; Ritz Dep., ECF 70-10, at 44:3–7. He stared at Plaintiff for long periods of time and

otherwise went out of his way to make her feel uncomfortable, including by criticizing her fast during Ramadan. Pl. Dep., ECF 70-2, at 224:13–21, 227:4–9, 243:13–44:9, 302:1–12, 306:12–16, 329:20–332:42, 380:9–85:3; Pl. Decl., ECF 70-12 at ¶ 10; Dania Decl., ECF 70-3, ¶¶ 6, 9; Coleman Dep., ECF 70-9, at 64:21–65:6, 124:21–125:10; Ritz. Dep., ECF 70-10, at 57:2–58:8 ("Habibi would just do his little blank stare at [Plaintiff], and like just watch [her and her sister], and so it just kind of made like everybody timid throughout the whole bar."). Coleman testified that if El Seoud ever stared at her the way he stared at Plaintiff, she would have found it "very weird and uncomfortable." *Id.* at 124:21–125:10. El Seoud also singled Plaintiff and her sister Dania out for additional work tasks, unwarranted scrutiny, accusations of misconduct, and threats of termination. Pl. Dep., ECF 70-2, at 159:2–161:17, 207:9–08:3, 211:9–13, 223:12–224:18, 235:3–236:2, 373:5–379:13; Dania Decl., ECF 70-3, ¶¶ 6, 22; Boyle Dep., ECF 70-22, at 61:20–62:7; Ritz Dep., ECF 70-10, at 54:5–56:14, 134:10–20, 144:3–18.

The fact that El Seoud's conduct toward Plaintiff was unwelcome is supported by testimony and copies of written communications showing that Plaintiff and Dania complained about El Seoud's treatment of Plaintiff to several Restaurant managers, including Hadel (Pl. Dep., ECF 70-2, at 227:10–19, 521:18–522:5; Dania Decl., ECF 70-3, ¶ 10), Forgrave (Boyle Dep., ECF 70-22, at 100:3–8, 102:10–104:6), and Kraus (Pl. Dep., ECF 70-2, at 220:7–9, 539:17–541:13; Def. Exh. 18, ECF 62-20). A reasonable juror could easily find that the above-described behavior by El Seoud was unwelcome.

### 2. Based on Sex or Religion

Plaintiff has also presented sufficient evidence to create a genuine dispute that El Seoud's unwelcome conduct toward her was based on her sex and religion. Many of the unwelcome comments El Seoud directed to Plaintiff, and comments he made to others about Plaintiff and

Dania, specifically and explicitly referenced their identity as Muslims and called their status as Muslims into question. *See, e.g.*, Pl. Dep., ECF 70-2, at 227:4–9, 302:1–19, 303:14–20, 305:12–15, 329:20–332:4; Dania Decl., ECF 70-3, ¶¶ 4, 12; Ritz Dep., ECF 70-10, at 44:3–7. Drawing reasonable inferences in Plaintiff's favor, El Seoud's comments also referenced Plaintiff's sex and gender, at least by implication, when El Seoud criticized her attire, work as a bartender, consumption of alcohol, and interactions with men. The same evidence shows that El Seoud did not subject other non-Muslim employees to the same treatment. For example, according to Plaintiff, El Seoud told her that she was "not a good Muslim" for drinking alcohol and that Muslim women should not work behind a bar or speak with men. Pl. Dep., ECF 70-2, at 302:13–19, 303:14–20, 305:12–15. He criticized Plaintiff's fast during Ramadan. *Id.* at 227:4–9, 302:1–12, 329:20–332:4. He told Dania that her mother should not approve of her Muslim daughters working as bartenders. Dania Decl., ECF 70-3, ¶ 4. He told another bartender, Jessica Ritz, that Dania "[was] a disgrace to [Islam] because she was drunk." Ritz Dep., ECF 70-10, at 44:3–7. Even when Plaintiff's religion and sex were not specifically referenced, record evidence shows that El Seoud singled Plaintiff out for additional work, special scrutiny, accusations, and threats, *see* Part III.B.1 *supra*, and that he did not subject other Restaurant employees to such mistreatment—apart from Dania, who is also a Muslim woman. A reasonable juror could find that El Seoud's unwelcome conduct was based on Plaintiff's sex and religion.

3. <u>Severe or Pervasive</u>

The third element of a hostile work environment claim requires an assessment of whether the conduct is "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment . . . ." *Boyer-Liberto*, 786 F.3d at 277. This inquiry has both objective and subjective components. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22

(1993); *Strothers*, 895 F.3d at 331; *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).

A plaintiff must show both that she "did perceive, and a reasonable person would perceive, the

environment to be abusive or hostile." *Id.* (quoting *Cent. Wholesalers*, 573 F.3d at 175). "Whether

the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable

person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner

Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Factors to consider include the frequency and

severity of the conduct, whether the employee is physically threatened or humiliated, and whether

there is an unreasonable interference with the employee's work performance. *Perkins*, 936 F.3d at

208 (citing *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008)). Evidence of

how others in the same workplace were treated can be considered, even where the plaintiff did not

actually witness the conduct. *Id.* at 209–10 (citations omitted). That the harassing conduct comes

from a supervisor rather than a coworker is also a factor for consideration for the third element.

*Boyer-Liberto*, 786 F.3d at 278 (citation removed). The "severe or pervasive" analysis is not, and

"by its nature cannot be, a mathematically precise test." *Id.* at 277 (quoting *Harris*, 510 U.S. at

22).

        The Court finds sufficient evidence in the record to create a genuine issue that El Seoud's

unwelcome conduct toward Plaintiff was both subjectively and objectively severe or pervasive

enough to alter the conditions of her employment at the Restaurant and create an abusive work

environment for her. Plaintiff attests that El Seoud made disparaging comments about her status

as a Muslim multiple times, Pl. Dep., ECF 70-2, at 207:1–20; 226:2–27:9; criticized her about

serving the Restaurant as a bartender "throughout [her] employment behind the bar[,]" *id.* at

303:1–6; expressed anger and disapproval whenever she drank an alcoholic beverage or ate or

drank anything during Ramadan, *id.* at 306:1–16, 329:20–30:8, 331:19; yelled accusations at her

about stealing hours and not properly clocking out "numerous times," *id.* at 211:3–16; singled her out by checking her handbags "[a]ll throughout" the second period of her employment at the Restaurant, *id.* at 373:15–74:9; and constantly stared at her for long periods of time while working, *id.* at 381:7–82:8; Pl. Decl., ECF 70-12 at ¶ 10. At times, El Seoud would shout at Plaintiff and subject her to special scrutiny in front of coworkers and customers. Pl. Dep., ECF 70-2, at 202:19–204:14, 207:9–08:3; Coleman Dep., ECF 62-17, at 71–72. Ritz testified that she noticed El Seoud staring at Plaintiff almost every time Ritz and Plaintiff worked a shift together, Ritz Dep., ECF 70-10, at 58:8–10, and that El Seoud's singling out of Plaintiff "happened so often" that it was "normal." *id.* at 54:2–18 ("They normalized it, like [El Seoud] being rude and everything, making [Plaintiff] do extra stuff for no reason.").

The Court finds that the frequency and severity of El Seoud's behavior, as described in Plaintiff's and other witnesses' testimony, would be enough for a reasonable person in Plaintiff's position to find it abusive and hostile. It is also apparent from Plaintiff's testimony that she subjectively found El Seoud's conduct to be abusive and hostile. For example, Plaintiff testified that El Seoud's comments about Plaintiff and Dania "disgracing" their religion, staring, and abusive behavior toward the sisters on the night of the charity event (December 17, 2019) induced anxiety in Plaintiff for the remainder of her shift and caused her to cry when she got home after work. Pl. Dep., ECF 70-2, at 234:1–35:2; Pl. Decl., ECF 70-12, ¶ 6. In sum, a reasonable juror could find that El Seoud's unwelcome conduct was severe or pervasive enough to create a hostile work environment for Plaintiff.

### 4.  Imputable to the Employer

Finally, a claim for a discriminatory hostile work environment requires grounds for imposing liability on the employer. *Sunbelt Rentals*, 521 F.3d at 319. A hostile work environment

is imputable to an employer under Title VII if it is created by a supervisor with authority over the employee, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); or if the employer "knew or should have known" about coworker harassment and "failed to take effective action to stop it[,]" *Sunbelt Rentals*, 521 F.3d at 319 (citation omitted). The MFEPA also imposes liability on an employer for workplace harassment by supervisors or if the employer's negligence "led to the harassment or the continuation of harassment." Md. Code. Ann., State Gov't § 20-611.

### a. *Supervisor Harassment*

A workplace harasser qualifies as a supervisor under Title VII when "he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Liability for supervisor harassment is broader under the MFEPA. Under that statute, "an employer is liable . . . for the acts or omissions toward an employee or applicant committed by an individual who: (i) undertakes or recommends tangible employment actions affecting the employee, or (ii) directs, supervises, or evaluates the work activities of the employee[.]" Md. Code. Ann., State. Gov't § 20-611(1). Tangible employment actions are those that can cause "direct economic harm" to the employee, such as hiring or firing. *Vance*, 570 U.S. at 440 (citing *Ellerth*, 524 U.S. at 762). An employer can shield itself from vicarious liability for supervisor harassment by showing that it exercised reasonable care to correct or prevent the harassing behavior and that the victim employee unreasonably failed to take advantage of available preventative or corrective measures. *Id.* at 424 (citing *Faragher*, 524 U.S. at 807, and *Ellerth*, 524 U.S. at 765).

The parties dispute whether El Seoud qualifies as Plaintiff's supervisor for purposes of establishing employer liability. El Seoud never took any tangible employment actions against

Plaintiff, and Restaurant managers testified that El Seoud was not empowered to take tangible employment actions against Plaintiff. J. Minadakis Dep., ECF 62-4, at 33:6–8; Parker Dep., ECF 62-12, at 32:21–33:1 ("[El Seoud] doesn't hire or fire bartenders or servers."). John described El Seoud as a kitchen manager who supervised the completion of work tasks by other employees and made recommendations as to tangible employment actions, but El Seoud was not authorized to suspend or fire employees unilaterally. J. Minadakis Dep., ECF 62-4, at 30:13–33:11. However, bartender Jessica Ritz testified that El Seoud once suspended her for a week without pay for breaking two glasses during a shift. Ritz Dep., ECF 70-10, 70:17–71:17. According to Ritz, El Seoud suspended her immediately after she broke the second glass and without going off to consult the owners or other managers to obtain approval. *Id.* at 129:1–30:7. Additionally, Dania states that El Seoud once threatened to suspend her. Dania Decl., ECF 70-3, ¶ 20.

Defendant argues that there is no evidence that El Seoud was empowered to take any tangible employment action against Plaintiff specifically. Def. Reply, ECF 74, at 15–16. But, like Ritz, Plaintiff served as a bartender at the Restaurant. In the absence of contrary evidence, a reasonable juror could infer that if El Seoud could, and did, suspend Ritz without pay, he could do the same to Plaintiff. *See Vance*, 570 U.S. at 437 n.9 (stating that a harasser with the authority to take disciplinary action against a victim with "economic consequences (such as suspension without pay) . . . might qualify as a supervisor" for purposes of a Title VII hostile work environment claim).

The Court finds the dispute over whether El Seoud was a supervisor with authority over Plaintiff to be a genuine one. Defendant has presented no evidence that it took reasonable care to prevent or correct El Seoud's harassing behavior or that there were preventative or corrective opportunities available to Plaintiff that she failed take. *See id.* at 424 (citation omitted). Therefore,

Defendant fails to show it is entitled to judgment as a matter of law on Plaintiff's Title VII hostile work environment claim.

The evidence that El Seoud's harassing conduct is imputable to Defendant under the MFEPA is even stronger. John testified that El Seoud was authorized to direct and order other employees to complete certain tasks, so long as "it was part of their job." J. Minadakis Dep., ECF 62-4, at 32:11–33:5. Further, Kraus states in her affidavit that El Seoud "[made] sure that all employees and managers alike [were] doing their jobs. If [El Seoud] observe[d] an employee or manager sitting around or not working during their shift, he addresse[d] it appropriately, and usually by informing a manager about the issue." Kraus Aff., Pl. Exh. 9-E, ECF 70-17, ¶ 4. Plaintiff and Dania claim that El Seoud would order them to clean up the bar and perform other tasks before allowing them to go home. Pl. Dep., ECF 70-2, at 159:2–161:17, 235:3–236:2; Dania Decl., ECF 70-3, ¶ 6. In her deposition, Plaintiff specifically described several instances in which El Seoud directed and supervised her work activities. *See, e.g.*, Pl. Dep., ECF 70-2, at 159:2–161:17, 207:9–208:3, 211:9–13, 223:12–224:18, 235:3–236:2; Ritz Dep., ECF 70-10, at 54:5–56:14, 134:10–20, 144:3–18. Viewing the record in the light most favorable to Plaintiff, there is sufficient evidence to suggest that El Seoud directed and supervised bartenders at the Restaurant and, therefore, to preclude summary judgment in Defendant's favor on Plaintiff's MFEPA workplace harassment claim.

### b. *Employer Negligence*

Even if it was undisputed that El Seoud was not Plaintiff's supervisor in any capacity, Defendant would still be liable for his harassing behavior in negligence if it "knew or should have known" about the harassment and "failed to take effective action to stop it." *Sunbelt Rentals*, 521 F.3d at 319 (citation omitted). "An employer cannot avoid Title VII liability for coworker

harassment by adopting a 'see no evil, hear no evil' strategy." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003). "Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Id.* at 334 (cleaned up). A workplace harassment claim under the MFEPA may also proceed against an employer on a theory of employer negligence. *See* Md. Code. Ann., State Gov't § 20-611 (employer is liable for workplace harassment under the MFEPA if its negligence "led to the harassment or the continuation of harassment").

Once an employer has notice of discriminatory harassment, it is required to take "prompt remedial action reasonably calculated to end the harassment." *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)). Moreover, an employer may be liable for a hostile work environment under Title VII when it negligently fails to provide reasonable procedures for employees to register complaints of coworker harassment. *Ocheltree*, 335 F.3d at 334. Where an employer fails to provide adequate procedures for reporting harassment at work, "a reasonable jury could find . . . constructive knowledge of [employee] harassment." *Amirmokri*, 60 F.3d at 1131. The adequacy of an employer's response to harassment is a matter for the trier of fact to resolve. *Id.* (citing *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)).

The Court finds genuine disputes of material fact bearing on whether Defendant was negligent in its handling of El Seoud's harassing behavior toward Plaintiff. As noted in Part III.B.1 *supra*, there is record evidence showing that Plaintiff lodged complaints about El Seoud's behavior with several managers, including Hadel, Forgrave, and Kraus. Plaintiff complained to Hadel about El Seoud's behavior in December 2019. Pl. Dep., ECF 70-2, at 521:18–522:5. Boyle testified that Plaintiff and Dania complained to "everyone" about El Seoud. Boyle Dep., ECF 70-22, at 100:3–

8. For example, in early 2020, she overheard Plaintiff complain to Forgrave about El Seoud's behavior and Forgrave promise to speak to him about it. *Id.* at 102:10–104:6. Plaintiff testified in her deposition that she complained to Kraus, among others, about El Seoud's behavior several times, Pl. Dep., ECF 70-2, 220:7–9, including in July 2020, *id.*, 539:17–541:13, after Kraus was promoted from bartender to manager in February 2020, *see* Kraus Dep., ECF 62-9, 8:5–6. Despite all of Plaintiff's complaints, the harassment continued unabated. Pl. Dep., ECF 70-2, at 219:16–220:9, 539:7–544:10. Indeed, El Seoud testified that he was not even aware that Plaintiff had lodged complaints about his behavior. *See* El Seoud Dep., Pl. Exh. 3, ECF 70-7, at 62:11–15. Drawing all inferences in Plaintiff's favor, a genuine dispute remains as to Defendant's negligence in response to Plaintiff's complaints.

Defendant argues that there is no evidence of its negligence "in controlling [Plaintiff's] working conditions," Def. Reply, ECF 74, at 15, but fails to identify any reasonable procedures it had in place for Plaintiff to seek corrective action for the harassment she suffered. For her part, Plaintiff contends that Defendant did not have *any* harassment policy or complaint procedure at the time of her employment. Pl. Opp'n, ECF 70, at 24–25. Based on the record before it, the Court cannot find that what policies and controls Defendant had in place at the Restaurant were sufficient as a matter of law.

Defendant attaches to its summary judgment motion portions of an employee handbook containing certain workplace policies that were presumably in place at the Restaurant during Plaintiff's employment. Def. Exh. 9, ECF 62-11. What policy existed at Restaurant regarding employee complaints of harassment is set forth under the heading "Issues at Work" as follows:

> If there is an issue, question, or concern, please contact your manager at a convenient time to mention the issue. We do not like to make a scene in the restaurant or in front of other employees. Stay away from the grapevine effect. If there is a problem, please discuss

it only to a manager. Do not discuss with other employees before you speak with management.

If there is a concern about your job, work environment, or something that you like or dislike, please voice it at our employee meetings. They are held so we can understand everyone's viewpoints on questions or concerns you may have. Our goal is to make our restaurant a happy, positive, environment.

*Id.* at 30.[13] Insofar as Defendant contends that the foregoing policy gave Plaintiff a reasonable means of seeking redress from El Seoud's harassing behavior, the Court finds the contention subject to genuine dispute.

In *Ocheltree*, the Fourth Circuit, sitting en banc, affirmed denial of an employer's motion for judgment as a matter of law on an employee's Title VII claim for hostile work environment,[14] holding that a reasonable jury could find that the employer "did not provide reasonable avenues for the plaintiff to voice her sexual harassment complaints." 335 F.3d at 335. The only "sexual harassment policy" that the employer had was presented in two sections of its employee handbook. *Id.* at 334. Like the policy in the instant case, the employer's policy in *Ocheltree* instructed employees "having a complaint or problem . . . first [to] try to resolve it with their immediate supervisor." *Id.* Unlike the policy at issue here, the policy in *Ocheltree* provided that matters not resolved by supervisors could be escalated to the company's executives. *Id.* That policy was nonetheless insufficient because it "fail[ed] to place any duty on supervisors to report incidents of sexual harassment to their superiors." *Id.* The court held that "a jury may give negative weight to the fact that a scheme does not require a supervisor, with whom complaints of sexual harassment

---

[13] The Court notes that Defendant appears to have had a separate sexual harassment policy, also contained in the employee handbook, *see* Def. Exh. 9, ECF 62-11 at 30, but Defendant does not contend that its sexual harassment policy is relevant to Plaintiff's claims.

[14] The *Ocheltree* court reversed the district court's award of punitive damages but affirmed the award of compensatory damages on the Title VII claim. 335 F.3d at 335–36.

must be lodged in the first instance, to forward unresolved complaints to higher authority." *Id.* at 335.

In the instant case, there is no evidence of any workplace policy at the Restaurant that required managers to do anything about workplace complaints reported to them. *See* Def. Exh. 9, ECF 62-11, at 30. Moreover, there is no evidence that the managers to whom Plaintiff reported El Seoud's harassing behavior actually did anything to correct the behavior or prevent it from continuing. A reasonable jury could find that Defendant had both actual knowledge and constructive knowledge of the harassment Plaintiff suffered and failed to take "prompt remedial action reasonably calculated to end the harassment." *Amirmokri*, 60 F.3d at 1131. Defendant is thus not entitled to summary judgment on Plaintiff's hostile work environment claims.[15]

## C. Discriminatory Suspension and Constructive Discharge

Plaintiff asserts claims for discrimination (i.e., disparate treatment) in violation of Title VII and the MFEPA based on allegations that Restaurant managers suspended her employment and constructively discharged her based on her sex and religion. Am. Compl., ECF 13, ¶¶ 74–100; Pl. Opp'n, ECF 70, at 19–22, 26–31. Defendant argues that Plaintiff is unable to establish that her working conditions were so intolerable as to force her to resign and constitute a constructive discharge. Def. Mem., ECF 62-2, at 18–22. As to Plaintiff's suspension, Defendant argues this adverse employment action was taken for legitimate reasons relating to Plaintiff's work performance and not based on her sex or religion. *Id.* at 23–28; Def. Reply, ECF 74 at 6–12.

---

[15] Plaintiff contends that, beginning in late June or July 2020 and continuing to the time of her suspension in August 2020, she and her sister Dania were unfairly targeted by the Restaurant's new managers and treated differently than other employees. She does not appear to assert any hostile work environment claim based on these perceptions of unfair treatment by the new managers. *See* Pl. Opp'n, ECF 70, at 22–26 (discussion of hostile work environment claim). Insofar as Plaintiff intends to assert such a claim, it fails as a matter of law for insufficient showing that the new managers' conduct was so severe or pervasive as to alter the conditions of Plaintiff's employment or that it was based on her sex or religion.

According to Defendant, Plaintiff fails to make a prima facie case or offer any direct evidence of sex- or religion-based discrimination. Def. Mem., ECF 62-2, at 16–28; Def. Reply, ECF 74 at 2–12.

"Disparate treatment occurs when an employer treats certain people less favorably than others on the basis of a protected classification[,]" such as sex or religion. *Perkins*, 936 F.3d at 207 (quoting *Carter v. Ball,* 33 F.3d 450, 456 n.7 (4th Cir. 1994)). A plaintiff bears the burden of proving claims of unlawful disparate treatment under Title VII through one of two methods. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F. 4th 643, 649 (4th Cir. 2021). The plaintiff may either offer "direct or indirect" evidence of discriminatory animus under "ordinary principles of proof" or follow the burden-shifting framework articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 433 (D. Md. 2022) (citing *Burns v. AAF-McQuay, Inc*., 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997), and *Sempowich*, 19 F. 4th at 649).

1. <u>Direct Evidence of Discrimination</u>

Plaintiff states that her sex- and religion-based discrimination claims rely primarily upon direct evidence. Pl. Opp'n, ECF 70, at 30.

"Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Bandy v. City of Salem*, 59 F. 4th 705, 711 (4th Cir. 2023) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003)). "[S]ome adverse employment action is required" to prevail on a claim of discrimination under Title VII. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). The

employer's action must "adversely affect[] the terms, conditions, or benefits of the plaintiff's employment." *Id.* (quoting *James*, 368 F.3d at 375). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Ellerth*, 524 U.S. at 761).

Plaintiff identifies a two-week unpaid suspension and constructive discharge as adverse employment actions in support of her disparate treatment claims. Judges of this Court and several other courts have recognized that suspension without pay constitutes an adverse employment action, considering its substantial impact on terms and benefits of employment. *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2007); *Wright v. Hertford Cnty. Bd. of Educ.*, No. 2:23-CV-30-D, 2024 WL 85926, at *13 (E.D.N.C. Jan. 8, 2024); *Maine v. Azar*, Civ. No. GLR-16-3788, 2021 WL 3617215, at *23 (D. Md. Aug. 16, 2021) (citing cases); *Snyder v. Azar*, Civ. No. TDC-18-0511, 2020 WL 4605223, at *6 (D. Md. Aug. 10, 2020), *aff'd sub nom. Snyder v. Becerra*, No. 20-2073, 2021 WL 5505403 (4th Cir. Nov. 24, 2021) (citing cases); *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 705 (D. Md. 2003).

A constructive discharge may also constitute an adverse employment action. *See Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 239 (4th Cir. 2018); *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013) (citing *Baker v. Baxa Corp.*, Civ. No. 09-CV-02034, 2011 WL 650002, at *1 (D. Colo. Feb. 11, 2011)). The doctrine of constructive discharge exists to shield employees "from a calculated effort to pressure [them] into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by [their] co-workers." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, 475 U.S. 1082 (1986). To establish a discriminatory constructive discharge in violation of Title VII, a plaintiff must show that (1) "[she] was

discriminated against by his employer to the point where a reasonable person in [her] position would have felt compelled to resign"; and (2) "[she] actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citation omitted). Perceived unfair criticism and frustrating working conditions are not so intolerable as to establish constructive discharge. *Carter,* 33 F.3d at 459. Constructive discharge requires that a reasonable person in the plaintiff's position "would have had *no choice* but to resign" as a result of "intolerable" work conditions. *Perkins*, 936 F.3d at 212 (citations omitted). The standard is an objective one, viewed from the plaintiff's standpoint. *Id.* Whether an employer acted deliberately or with "a subjective intent to force a resignation[]" is not sufficient to establish a constructive discharge. *E.E.O.C. v. Consol. Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) (citing *Green*, 578 U.S. 547). However, "an environment in which an employer makes clear to an employee her termination was imminent and that 'the axe [is] about to fall' may be objectively intolerable." *Decoster v. Becerra*, Civ. No. TDC-21-2195, 2022 WL 3083343, at *4 (D. Md. Aug. 3, 2022) (quoting *E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)).

The circumstances in which Plaintiff was suspended and eventually resigned from employment with Defendant are summarized as follows:

On August 2, 2020, John was advised of several complaints made by customers about the quality of Plaintiff's service that night and decided to suspend Plaintiff's employment for a period of two weeks. J. Minadakis Dep., ECF 62-4, at 149:1–19, 150:3–21, 162:4–21; Breeden Aff., Def. Exh. 27, ECF 62-29. Plaintiff was advised of the decision and its reasons and was required to sign a disciplinary form.[16] Pl. Decl., ECF 70-12, ¶¶ 17, 19; Singh Dep., ECF 62-16, at 109:17–110:8,

---

[16] A contemporaneous exchange of text messages among Restaurant managers contemplated that Plaintiff might resign after her suspension and be replaced by new employees. *See* Def. Exh. 28, ECF 62-30, at 4. However, this information cannot be considered in assessing whether the managers' conduct amounted to

114:1–7, 134:13–135:7, 136:2–7. Plaintiff was generally aware that suspended employees were normally reinstated automatically at the end of their suspension, but she was not placed back on the work schedule at her suspension. Pl. Dep., ECF 70-2, at 61:8–66:14; Dania Decl., ECF 70-3, ¶¶ 19, 20. Plaintiff met with a manager to discuss the issue, but no action was taken as a result. Pl. Dep., ECF 70-2, at 100:9–13; Kraus Dep., ECF 62-9, at 37:1–5. Plaintiff later discovered that she could no longer access Restaurant's online schedule. Pl. Dep., ECF 70-2, at 61:12–62:4. At some point, Dania asked Parker, a manager, why Plaintiff was not reinstated, and Parker made statements about Plaintiff not wanting to work at the Restaurant and Dania working better without Plaintiff around. Dania Decl., ECF 70-3, ¶ 20. Dania shared this information with Plaintiff. *Id.* On September 3, 2020, Plaintiff communicated with Parker by text message about resuming her work schedule. Def. Exh. 31, ECF 62-33. Although the manager offered and attempted to schedule Plaintiff's return to work, Plaintiff ultimately declined to respond to these efforts. She testified at her deposition that she considered herself to have been terminated and that she did not want to work at the Restaurant because of the length of the suspension, subsequent scheduling issues, their financial impact on her, and a feeling that she was unwanted as an employee. Pl. Dep., ECF 62-6, at 59:2–7, 65:9–66:14, 340:21–341:8.

First, Plaintiff cites no direct evidence to suggest that her suspension was based on her sex or religion. The decisionmaker at the Restaurant responsible for the suspension was John, and he made this decision in consultation with Parker, Paulino, and Singh. *See* Def. Exh. 28, ECF 62-30. Plaintiff cites no evidence that any behavior or statements by John or any of these managers reflect

---

a constructive discharge because there is no evidence that Plaintiff was aware of the messages at the time. *See Perkins*, 936 F.3d at 212 ("[I]ntolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign.") (cleaned up). Whether Plaintiff was constructively discharged turns on whether her working conditions were objectively intolerable—not whether the Restaurant managers subjectively intended to force her resignation. *See Consol Energy*, 860 F.3d at 144 (citing *Green*, 578 U.S. 547).

any sex- or religion-based discriminatory attitude or animus. Plaintiff's disagreements with the customer complaints cited to justify her suspension, and the fact that she was not consulted about this decision and did not receive warnings, offer nothing to suggest that the suspension was discriminatory.

Second, as to Plaintiff's discriminatory constructive discharge claim, there is no direct evidence she suffered sex- or religion-based discrimination "to the point where a reasonable person in [her] position would have felt compelled to resign." *Green*, 578 U.S. at 555. The status and conditions of Plaintiff's employment at the time she rejected Parker's efforts to reinstate her were not objectively intolerable. Prior to September 3, 2020, Plaintiff may have believed that she was not welcome to return to work at the Restaurant based on the failure to schedule her for work at the end of her suspension after she notified Kraus she had not been reinstated, and based on statements Parker made to Dania suggesting he did not want Plaintiff working there. However, any such reasonable belief would have been dispelled when Parker offered to return Plaintiff to her normal working hours on September 3, 2020. *See* Def. Exh. 31, ECF 62-33. Plaintiff contends that, beginning in late June or July 2020, she and her sister Dania were unfairly targeted by the Restaurant's new managers and treated differently than other employees, but this conduct by the new managers did not compel Plaintiff to resign and would not have compelled a reasonable person in her position to resign. *See Carter,* 33 F.3d at 459 (unfair criticism and frustrating work conditions do not amount to constructive discharge).

Moreover, even if a reasonable person would have felt compelled to resign by the totality of Plaintiff's interactions with management between June and September 2020, there is no evidence to show that the circumstances compelling resignation were discriminatory. Plaintiff identifies no evidence to suggest that any of the actions or omissions taken by John or any of the

new managers involved in her suspension, delayed reinstatement, or perceived unfair targeting were based on Plaintiff's sex or religion. The only evidence that Plaintiff and Dania were unfairly targeted by the new managers merely reflects disagreements with the managers about the sisters' conduct at work and makes no reference to their sex or religion. There is no direct evidence of unlawful discrimination by any of these managers. El Seoud is the only individual for whom evidence has been presented to indicate any discriminatory animus toward Plaintiff, and there is no evidence to suggest that he had any involvement in either the decision to suspend Plaintiff or any of the circumstances that may have precipitated her resignation.

Plaintiff attempts to augment her constructive discharge claim by reference to El Seoud's pattern of abusive behavior toward her and Dania during her second period of her employment, before she was suspended. *See* Pl. Opp'n, ECF 70, at 21–22 (arguing that the scheduling issues and loss of compensation Plaintiff endured during and after her suspension should be "[v]iewed in concert with Habibi's protracted campaign of discriminatory and abusive behavior against her"). Defendant argues that El Seoud's conduct toward Plaintiff was "*unrelated*" to her suspension and alleged constructive discharge. Def. Mem., ECF 62-2, at 25. As explained in Part III.B *supra*, Plaintiff has made a sufficient showing to survive summary judgment on her hostile work environment claims based on workplace harassment by El Seoud. However, the Court agrees with Defendant that there is no evidence that El Seoud's harassing behavior was at all related to the suspension or any other circumstances surrounding Plaintiff's decision not to return to the Restaurant. And there is insufficient evidence that El Seoud's conduct, in itself, amounted to a constructive discharge.

A discriminatory constructive discharge can also occur where there is an "aggravated case of . . . hostile work environment." *Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). A

claim for hostile-environment constructive discharge must show "something more" than a hostile work environment. *Id.* at 131. The harassment must be so severe that it becomes objectively intolerable. *Id.* The "frequency of the conditions at issue" is critical to a finding of intolerability. *Evans*, 936 F.3d at 193; *see also Amirmokri*, 60 F.3d at 1132 (an employee being subjected to public embarrassment and "almost daily" epithets about his Iranian heritage, resulting in an ulcer and eventual resignation, create a genuine dispute of material fact regarding intolerability). Again, to establish an actionable constructive discharge, a plaintiff must show that she "actually resign[ed] *because of* [the intolerable] conditions." *Perkins*, 936 F.3d 196, 211–12 (citing *Green*, 578 U.S. 547) (emphasis added); *see also Suders*, 542 U.S. at 148 ("A constructive discharge involves both an employee's decision to leave and precipitating conduct . . . .").

Here, viewing the record evidence in its totality, Plaintiff fails to show that any hostile work environment created by El Seoud's treatment of her caused or precipitated her decision not to return to work at the Restaurant. Plaintiff testified in her deposition that she declined to return to work due to her treatment by the managers responsible for her suspension and their subsequent failure to place her back on the work schedule, as well as her loss of pay. Pl. Dep., ECF 62-6, at 59:2–7, 65:9–66:14, 340:21–341:8. There is no indication in the record that El Seoud's harassment of Plaintiff rendered her work conditions so intolerable that she was left with "*no choice* but to resign" or that it caused her to resign. *Perkins*, 936 F.3d at 212 (citations omitted).

Moreover, the record evidence is insufficient to establish that El Seoud's harassing conduct occurred with such frequency as to render Plaintiff's work conditions objectively intolerable—particularly not during the period in which she was suspended and declined to return to work after her suspension. Unlike *Amirmokri*, 60 F.3d at 1132, there is no evidence that El Seoud's harassment of Plaintiff occurred on anything close to a daily basis, for example. Plaintiff attests

generally that El Seoud harassed her throughout her employment, *see, e.g.*, Pl. Dep. ECF 62-6, at 203:6–10, 303: 1–2, 373: 15–75:2, and that he "continued to make [her] extremely uncomfortable by coming outside to stare at [her]" even "[a]fter the restaurant's indoor dining was shutdown." Pl. Decl., ECF 70-12, ¶ 10. The only specific instance of this behavior, however, occurred in May 2020. *Id.* At that time, El Seoud's conduct did not cause Plaintiff to resign. She continued to work at the Restaurant for at least another two months before the events giving rise to her suspension in August 2020 and subsequent scheduling issues that precipitated her decision not to return to work. Furthermore, as noted *supra*, there is no evidence El Seoud was involved in either the suspension or Defendant's failure or delay in scheduling Plaintiff's return to work.

For the foregoing reasons, Plaintiff's claims of sex- and religion-based disparate treatment fail under a direct-evidence standard.

2.   Proof of Discrimination Under Burden-Shifting Frameworks

In the absence of direct evidence, claims of employment discrimination may be sustained under the burden-shifting framework devised in *McDonnell Douglas*. Under this framework, the plaintiff is required first to establish a prima facie case of discrimination. The precise formulation of the required prima facie showing will vary in "differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.

Generally, a prima facie case of disparate treatment requires the plaintiff to show: "(1) membership in a protected class; (2) satisfactory work performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Perkins*, 936 F.3d at 207. In a case where discriminatory discharge is alleged, a prima facie case can be made without identifying a similarly situated but differently treated co-worker, as long as "the adverse action occurred under circumstances that raise a reasonable inference of unlawful

discrimination . . . ." *Sempowich*, 19 F. 4th at 649–50. This prima facie showing is satisfied where, after termination, the employer leaves the position open or "replace[s] the plaintiff with someone outside the protected class." *Id.*

Judges of this Court have joined other courts in recognizing a modified prima facie standard for certain religious discrimination claims. *See Yancey v. Nat'l Ctr. on Institutions & Alternatives*, 986 F. Supp. 945, 954 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *see also Fanord v. Wash. Metro. Area Transit Auth.*, Civ. No. TDC-14-3973, 2017 WL 3887855, at *5 (D. Md. Sept. 5, 2017) (following *Yancey*). This standard requires a plaintiff to show "(1) that [she] was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." *Yancey*, 986 F. Supp. at 954 (citing *Shapolia v. Los Alamos Nat'l Labs.*, 992 F.2d 1033, 1038 (10th Cir. 1993)).

Irrespective of the precise formulation, if a plaintiff establishes a prima facie case, a presumption of illegal discrimination or retaliation arises and the burden of production shifts to the employer to state a legitimate, non-discriminatory reason for its adverse action. *Hoyle*, 650 F.3d at 336. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). To prevail, the plaintiff must then prove "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Id.* at 256.

As noted in Part III.C.1 *supra*, Plaintiff's disparate treatment claims appear to rely primarily upon direct evidence, rather than any of the foregoing burden-shifting frameworks. She states in her opposition that she "is under no obligation to identify similarly situated comparators" under the direct evidence standard, Pl. Opp'n, ECF 70, at 30, and does not argue that she has presented a prima facie case of disparate treatment under any formulation. She makes no attempt to identify a similarly situated comparator outside her protected classes, *see Perkins*, 936 F.3d at 207, and she offers no evidence that, after her employment ended, Defendant replaced her with someone outside her protected classes, *see Sempowich*, 19 F. 4th at 649–50.

The only reference Plaintiff makes in her opposition to *Yancey* is to distinguish the facts of that case—not to argue that she satisfies the prima facie burden stated therein. *See* Pl. Opp'n, ECF 70, at 28 (arguing that "Defendant's reliance upon *Yancey* . . . is misplaced"). Insofar as Plaintiff's claims rely upon the *Yancey* standard, her claims fail as a matter of law. For reasons stated in Part III.C.1 *supra*, Plaintiff fails to present any evidence to support an inference that she was suspended or constructively discharged "because of a discriminatory motive based upon the [her] failure to hold or follow . . . her employer's religious beliefs." *Yancey*, 986 F. Supp. at 954.

Plaintiff also fails to offer evidence that she satisfied her employer's legitimate expectations during the relevant period of her employment. Although she argues at length that her job performance was satisfactory, Pl. Opp'n, ECF 70 at 26–30, this argument relies upon facts that either are not supported by competent evidence or do not concern her job performance at the time she was suspended. *See* Pl. Exh. 9-A, ECF 70-13 (unauthenticated text messages with Restaurant manager Kenny Hadel from 2017 and 2019, and customer review from February 2020). To be clear, "Plaintiff's own opinions about [her] job performance, without more, [are] insufficient to show satisfactory job performance in connection with his employment discrimination claims."

*Conteh v. Diversified Prot. Corp.*, Civ. No. LKG-20-03032, 2022 WL 874937, at *7 (D. Md. Mar. 24, 2022). "'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (citation omitted). Plaintiff's subjective opinion and unauthenticated reviews cannot call into genuine dispute Defendant's competent evidence that Plaintiff was late for work multiple times during the relevant period, that she received several customer complaints the day she was suspended, and that, as a result, Defendant deemed her job performance unsatisfactory. Finally, Plaintiff also fails to show that Defendant's issues with her job performance were merely a pretext for discrimination because, again, there is no evidence that Defendant was at all motivated by Plaintiff's sex or religion in deciding to suspend her or failing to schedule her return to work promptly after the suspension.

In sum, Plaintiff's disparate treatment claims fail as a matter of law under any applicable burden-shifting framework.

## D. Retaliation

Plaintiff claims that Defendant unlawfully retaliated against her in violation of Title VII by taking the same adverse actions she identifies in support of her claims of sex- and religion-based discrimination—*i.e.*, hostile work environment, unpaid suspension, and constructive discharge. Am. Compl., ECF 13, ¶¶ 101–06; Pl. Opp'n, ECF 70, at 31–34. Defendant argues that Plaintiff's retaliation claims fail as a matter of law because (1) she did not engage in legally protected activity, and (2) she cannot show a causal connection between her complaints and any adverse action Defendant took against her. Def. Mem., ECF 62-2, at 31–35.

Employers are prohibited under Title VII from retaliating against an employee for reporting discrimination in the workplace. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir.

2015); *see also* 42 U.S.C. § 2000e–3(a). Retaliation may be shown through either "direct evidence of retaliatory animus" or a *McDonnell Douglas* burden-shifting framework. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021). A prima facie case of retaliation requires a plaintiff to establish "(1) that she engaged in a protected activity, (2) that her employer took an adverse action against her, and (3) that there was a causal link between the two events." *Laurent-Workman v. Wormuth*, 54 F. 4th 201, 212 (4th Cir. 2022) (citation omitted).

Regarding the first element, employee activities protected under Title VII include "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (citation omitted). "[A]n employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful . . . .'" *Id.* (quoting *Boyer-Liberto*, 786 F.3d at 282). However, "[n]ot all employee complaints are protected by Title VII's retaliation provision . . . ." *McIver v. Bridgestone Ams., Inc.*, 42 F. 4th 398, 411 (4th Cir. 2022). "Complaints about management activities that would not constitute unlawful discrimination[,]" *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 604 (D. Md. 2018), such as "[g]eneral complaints of unfair treatment[,]" do not constitute protected activity under Title VII, *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016).

As to the second element, the adverse action must be such that "a reasonable employee would have found the challenged action[s] materially adverse," that is, sufficient to dissuade a reasonable employee from engaging in protected activity. *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2005); *see also Strothers*, 895 F.3d at 327. Thus, when an employee claims that a hostile work environment resulted from a retaliatory motive, she must show "unwelcome"

conduct that is both (1) "sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination" and (2) imputable to the employer. *Laurent-Workman*, 54 F. 4th at 218. "An employer is liable for retaliation only if the person with retaliatory animus 'can be deemed a decisionmaker for, or agent of' the employer taking adverse action against the employee." *McClain v. Lynchburg City Sch.*, 531 F. Supp. 3d 1115, 1130–31 (W.D. Va. 2021) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004)).

The third element of a prima facie case of retaliation is a causal relationship between the protected activity and the adverse action. "Establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers*, 895 F.3d at 335. A causal connection may be established at the prima facie stage by "facts to suggest that the adverse action occurred because of the protected activity" or "sufficient temporal proximity" between the protected activity and the adverse action. *Roberts*, 998 F.3d at 123 (cleaned up). Either way, the plaintiff "must show that the decisionmaker [for the adverse action] was aware of the protected activity at the time the alleged retaliation occurred." *Id.* at 124 (citing *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006)). When a plaintiff relies solely on temporal proximity, the employer's learning of the protected activity must be very close in time to the adverse action. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

Once the employee has made a prima facie showing of retaliation, the burden shifts to the employer to show the adverse action was taken for legitimate, non-retaliatory reasons. *Roberts*, 998 F.3d at 122 (citing *Foster*, 787 F.3d at 250). If the employer presents a legitimate, non-retaliatory reason, the burden then shifts to the employee to show pretext. *Id.* (citing *Foster*, 787

F.3d at 250). To carry her burden at the pretext stage, the employee "must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (cleaned up). Specifically, the employee must show that "but for" the employer's retaliatory motive, the adverse action would not have been taken. *Id.* (citation omitted).

Plaintiff identifies two instances in which she contends that she engaged in protected activity under Title VII: (1) her complaint to Hadel on December 18, 2019, and (2) her complaint to Kraus on July 21, 2020. ECF 70 at 31–32. She claims to have suffered (1) retaliatory workplace harassment in response to the December 2019 complaint, and (2) suspension and constructive discharge in retaliation for the July 2020 complaint. *Id.* at 33.

    1.  <u>Retaliatory Hostile Work Environment</u>

Plaintiff's claim of retaliatory hostile work environment in response to the December 2019 complaint to Hadel fails as a matter of law because she presents no evidence of any causal relationship between this complaint and any workplace harassment.

Plaintiff and her sister Dania state that on December 17, 2019—the night a charity event was held at the Restaurant—they suffered various forms of unwelcome conduct by El Seoud while Plaintiff was bartending, including angry stares, loud accusations of serving free drinks to her friends, and demands that she rifle through the trash to find cash receipts for the drinks. Pl. Dep., ECF 70-2, at 223:12–224:18; Dania Decl., ECF 70-3, ¶ 9. Following this incident, Plaintiff told Hadel about El Seoud's behavior, specifically that he was harassing her and Dania "because they were not acting in accordance with his religious beliefs for how Muslim women should behave and he did not like them serving or drinking alcohol or talking to male guests." Pl. Ans. to Interrog. 9, ECF 62-18. Hadel was the "head manager" of the Restaurant at the time. J. Minadakis Dep.,

ECF 62-4, at 27:12–28:2. The record suffices to create a genuine issue that Plaintiff engaged in protected activity in December 2019.

According to Plaintiff, in early January 2020, El Seoud made comments to a coworker, with whom Plaintiff had an interpersonal conflict, that the coworker should "stomp on" Plaintiff and compared her to a rabbit. Plaintiff contends that these comments by El Seoud were part of a larger trend of harassment that rendered the workplace an abusive environment for Plaintiff. *See* Part III.B *supra* (finding record evidence sufficient to support Plaintiff's discriminatory hostile work environment claim).

Plaintiff's retaliatory hostile work environment claim fails, however, because she fails to show any causal relationship between her complaint of discrimination to Hadel and El Seoud's unwelcome conduct. El Seoud testified he was not aware that Plaintiff had complained about his behavior. *See* El Seoud Dep., Pl. Exh. 3, ECF 70-7, at 62:11–15. Plaintiff claims that, upon receiving her complaint, Hadel promised to speak to El Seoud about his behavior, Pl. Answer to Interrog. 9, ECF 62-18; Pl. Dep., ECF 70-2, at 543:4–6, but there is no evidence in the record to show that he did.[17] If El Seoud was not aware of Plaintiff's protected activity, then his subsequent behavior—however unwelcome or harassing—could not have been caused by the protected activity, however close the two events were in time.

In sum, there is no genuine dispute as to whether any harassing behavior by El Seoud was caused by any protected activity by Plaintiff. Accordingly, this conduct by El Seoud cannot support a a prima facie case of Title VII retaliation. Defendant therefore is entitled to summary judgment

---

[17] Hadel denies that Plaintiff complained to him about any discriminatory harassment by El Seoud. *See* Hadel Aff., ECF 62-15, ¶¶ 5, 7 ("Ms. Hammoud never complained to me that she was being targeted by Habibi or treated differently by Habibi in any way."). The Court cannot make credibility determinations or otherwise resolve genuine factual disputes on a motion for summary judgment. *See Anderson*, 477 U.S. at 249.

on Plaintiff's claim of retaliation for her December 2019 complaint to Hadel and any other claim of retaliation based upon workplace harassment by El Seoud.[18]

2.   Retaliatory Suspension and Constructive Discharge

Plaintiff's claims of retaliatory suspension and retaliatory constructive discharge in response to the July 2020 complaint to Kraus fail for the same reason: she cannot establish a causal relationship between this complaint and the subsequent adverse actions. The retaliatory constructive discharge claim additionally fails because Plaintiff is unable to show she was constructively discharged at all, as explained in Part III.C *supra*.

After receiving word that Plaintiff's conduct at work was discussed during a manager's meeting at the Restaurant on July 20, 2020, Plaintiff contacted Kraus with concerns that she was being unfairly targeted by another manager. Pl. Dep., ECF 70-2, at 216:20–220:6; Def. Exh. 34, ECF 62-36. Plaintiff attests that she met with Kraus in person on July 21, 2020, with a range of complaints, including workplace harassment dating back to December 2019, presumably by El Seoud.[19] *See* Pl. Dep., ECF 70-2, at 219:16–220:9, 539:7–544:10.

On August 2, 2020, Defendant imposed a two-week unpaid suspension upon Plaintiff and, after the two weeks expired, failed to schedule Plaintiff's return to work. The decisionmaker responsible for the suspension was co-owner John Minadakis. The record is not entirely clear as to which Restaurant manager was responsible for the failure to reinstate Plaintiff after her

---

[18] Plaintiff does not appear to contend that her suspension and constructive discharge in August 2020 were in retaliation for her complaint of discrimination to Hadel in December 2019. *See* ECF 70 at 33. Insofar as she intends to assert such a retaliation claim, it fails for lack of any causal connection. The events are not sufficiently close in time to support any inference of causation on its own, *see Penley*, 876 F.3d at 657 ("[E]ight to nine months is too distant to raise an inference of causation."), and Plaintiff does not identify any evidence to support such an inference.

[19] For purposes of the summary judgment motion, Defendant does not dispute Plaintiff's claims about the meeting with Kraus. Def. Mem., ECF 62-2, at 13 n.13.

suspension, but it appears to have been either B.J. Parker or Katie O'Connor. *See* Def. Exh. 31, ECF 62-33 (text exchange in which Parker offers to have Plaintiff reinstated to her normal hours); J. Minadakis Dep., Def. Exh. 2, ECF 62-4, at 151:2–152:12 (John testifying that O'Connor "makes the schedules" and he consulted her upon realizing that Plaintiff had not been returned to work after the two-week suspension). There is no indication in the record that Kraus had any responsibility for scheduling Plaintiff for work after her suspension expired. Assuming without deciding that Plaintiff's complaints to Kraus on July 21, 2020, were a protected activity, she fails to present a prima facie case of retaliation because she identifies no evidence to show or support a reasonable inference that either John or any manager responsible for scheduling was aware of the protected activity. If the relevant decisionmakers responsible for the materially adverse actions against Plaintiff were not aware of the protected activity in the first place, there can be no causal link between the two.

Even if Plaintiff were to make a prima facie showing of retaliation based on her suspension, Defendant offers legitimate, nonretaliatory reasons for this adverse action—*i.e.*, multiple reports of poor customer service. *See* Def. Exh. 28, ECF 62-30; J. Minadakis Dep., ECF 62-4, at 162:4–21; Breeden Aff., ECF 62-29, ¶¶ 4–8. As a result, the burden would shift to Plaintiff to "establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Foster*, 787 F.3d at 252 (cleaned up). Plaintiff fails to meet this burden.

## IV.    MOTION TO STRIKE

While briefing its motion for summary judgment was ongoing, Defendant moved to strike certain portions of Plaintiff's submissions in opposition to the summary judgment motion. Mot. to Strike, ECF 73.

Courts have significant discretion in choosing whether to grant a motion to strike so as to "minimize delay, prejudice and confusion by narrowing the issues for discovery and trial." *Blevins v. Piatt*, Civ. No. ELH-15-1551, 2015 WL 7878504, at *2 (D. Md. Dec. 4, 2015) (quoting *Haley Paint Co. v. E.I. du Pont de Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012)). Striking portions of a pleading is "a drastic remedy" and, accordingly, motions to strike are "generally viewed with disfavor." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). Unless the portions of a pleading challenged have "no possible relation to the controversy and may prejudice the other party," a motion to strike will generally be denied. *U.S. ex rel. Ackley v. IBM*, 110 F. Supp. 2d 395, 406 (D. Md. 2000) (citations omitted). Yet this general disfavor is relaxed when the challenged statements are scandalous or derogatory. *Asher & Simons, P.A. v. J2 Glob. Can., Inc.*, 965 F. Supp. 2d 701, 702 (D. Md. 2013). "Scandalous pleadings . . . are those which reflect cruelly upon the defendant's moral character, use repulsive language, or detract from the dignity of the court. To be scandalous, such degrading charges must be irrelevant, or, if relevant, must be gone into in unnecessary detail." *Nault's Auto. Sales, Inc. v. Am. Honda Motor Co.*, 148 F.R.D. 25, 30 (D.N.H. 1993) (cleaned up). "When reviewing a motion to strike, the court must view the pleading under attack in a light most favorable to the [nonmovant]." *Blevins*, 2015 WL 7878504, at *2 (citation omitted).

Defendant requests that the Court "[s]trike the last paragraph beginning on page seventeen of Hammoud's Opposition and continuing onto page eighteen[,] . . . footnote 17 from Hammoud's Opposition[,] . . . footnote 23 from Hammoud's Opposition[,] . . . [and] ¶¶ 21–25 of the Dania Hammoud Declaration." ECF 73 at 14; *see also* ECF 73-1 at 1–2. Defendant also argues that portions of pages 29 and 34 should be stricken. ECF 73 at 8–10. The Court declines to compound any harms arising from the challenged statements by repeating them in detail here.

The Court agrees with Defendant that Plaintiff's statement on page 18 of her opposition implying that Defendant concealed records subject to disclosure improperly calls Defendant's counsel's credibility into question without any factual basis. Plaintiff's counsel is admonished to refrain from making such statements as they are not relevant to the merits of Defendant's summary judgment motion, embrace unfounded scandal, and "detract from the dignity of the court." *Nault's Auto. Sales*, 148 F.R.D. at 30. Additionally, it is improper for Plaintiff, in footnote 17 of her opposition brief, to reference to prior, separate litigation involving Defendant unrelated to the instant case and to make inflammatory accusations of unlawful conduct not at issue in the instant case. For these reasons, in ruling on the summary judgment motion, the Court has not considered the first complete sentence at the top of page 18 of Plaintiff's opposition brief nor footnote 17 on the same page. These statements shall be stricken from the record.

However, the statements as to whether Plaintiff was paid for days she was scheduled to work will not be stricken. Plaintiff has presented some evidentiary basis for the statements, and they are relevant to issues in this litigation.

Footnote 23, on page 27 of Plaintiff's opposition brief, essentially accuses a non-party witness of perjury. A party is free to take issue with the credibility of any witness, and, in this instance, Plaintiff appears to have a basis for doing so. At the same time, the accusation that the witness offered inaccurate testimony "knowingly" is needlessly inflammatory. In its discretion, the Court will not employ the drastic remedy of striking the challenged statement, however, as it is relevant to the merits of Defendant's summary judgment motion.

Finally, Defendant challenges statements in Plaintiff's opposition brief describing certain complaints from Restaurant customers about Plaintiff's service on August 2, 2020, "ginned-up." *See* Pl. Opp'n, ECF 70, at 29, 30, 34. The customer complaints, and the credibility of the

49

complaints, are certainly relevant to issues presented in this litigation. But, given the dearth of evidence that the customer complaints were fabricated, the Court finds that these statements at least border on improper and unfounded scandal. Plaintiff's counsel is admonished to temper his advocacy with discretion, reasonableness, and faith to the evidentiary record. However, the Court recognizes, again, that litigants are within their rights to dispute the credibility of witnesses. For this reason, in its discretion, the Court declines to strike the statements regarding customer complaints.

The Court also declines to strike the testimonial statements contained in paragraphs 21 through 25 of Dania's declaration. To the extent that facts offered in these paragraphs is not relevant to the merits of Defendant's summary judgment motion, or are based on inadmissible hearsay, the Court has not considered them. It is not necessary for a court to pour through an evidentiary record to strike any and all statements that are arguably irrelevant or arguably constitute hearsay. Such an exercise would serve no useful purposes. The Court declines to strike the challenged portion of Dania's declaration.

## V.    CONCLUSION

For the reasons stated herein, the Court will grant in part, and deny in part, Defendant's Motion for Summary Judgment (ECF 62) and Motion to Strike (ECF 73). Summary judgment will be granted in Defendant's favor on Plaintiff's claims of sex- and religion-based discrimination or disparate treatment under Title VII and MFEPA, as well as her Title VII retaliation claims. Plaintiff's claims of hostile work environment or workplace harassment under Title VII and MFEPA based on the conduct of El Seoud and Defendant's negligence shall proceed. The first complete sentence at the top of page 18 of Plaintiff's opposition brief and footnote 17 on the same page shall be stricken.

A separate Order shall issue.

May  29 , 2024

_____

Matthew J. Maddox
United States District Judge